**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| RICK SCOTT, in his official capacity as governor of Florida; STATE OF FLORIDA, by and through PAMELA JO BONDI, in her official capacity as attorney general of the state of Florida; AGENCY FOR HEALTH CARE ADMINISTRATION, <br><br><br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SYLVIA BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; ANDY SLAVITT, in his official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      No. |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**PRELIMINARY STATEMENT**

1.    This case concerns an attempt by the federal government to do precisely what the Supreme Court held just three years ago that the Constitution prohibits it from doing—namely, coerce States into dramatically expanding their Medicaid programs by threatening to cut off federal funding for unrelated programs unless they "agree" to do so. *See Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566 (2012).

2.     For nearly a decade, the federal government has provided the State of Florida with substantial funding for a Low Income Pool ("LIP") program designed to offset the costs healthcare providers incur when they provide healthcare to uninsured, underinsured, low-income, and other vulnerable populations.  This funding also ensures that crucial state services, such as health care administered by children's hospitals and medical schools, are available to all Floridians.

3.     Since the inception of the LIP program in Florida, Florida has routinely requested and always received hundreds of millions of dollars annually—and, last year, more than $1 billion—in federal funding for the LIP program from the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that approved the LIP program at its inception.

4.     Although CMS agreed to provide Florida with approximately $1.3 billion in federal LIP funding in 2014, it expressed concerns about the transparency of the program and how funds were channeled to healthcare providers, and indicated that these concerns would need to be addressed in order to continue receiving funding in the future.

5.     To address and alleviate those concerns, Florida spent the following year examining the current state of the LIP program and negotiating in good faith with CMS to propose changes to the program to address CMS's concerns, with the goal to renew its LIP funding through June 30, 2017.  Florida repeatedly informed CMS that, due to its legislative calendar and budget year, it needed an agreement in principle by mid-April 2015.  At the direction of CMS, the State hired an independent consulting firm, Navigant Consulting, Inc., to conduct an exhaustive review of the LIP program as well as other

healthcare funding available through Medicaid in Florida.  Navigant produced a report that the State and CMS agreed would assist in adjusting the program to maximize care for vulnerable populations while minimizing unnecessary or less effective expenditures. CMS repeatedly assured the State that its funding application would be reviewed flexibly and negotiated informally.  Florida took CMS at its word, as it earnestly responded to the concerns expressed by CMS and proposed myriad solutions to satisfy the constantly moving target of guidelines that CMS provided over the course of negotiations.

6.      Florida also endeavored to address any concerns CMS might raise regarding the impact of the State's constitutionally protected decision not to opt into the Medicaid expansion program created by the Affordable Care Act.  Although the Supreme Court held in *NFIB* that the federal government may not condition preexisting Medicaid funding on Medicaid expansion, Florida volunteered to endeavor to tailor the current size of the LIP program so that LIP funding would not be used to offset uncompensated care costs attributable to patients whose care would be covered by Medicaid were Florida to opt into the expansion.  At the same time, the State repeatedly reminded CMS that two independent studies had concluded that Florida would continue to face massive uncompensated care costs—by one estimate, $1.6 billion—even if it opted into Medicaid expansion.  In other words, the State made clear to CMS that its LIP program serves needs separate and distinct from those that could be addressed by opting into Medicaid expansion.

7.      On April 14, 2015, CMS abruptly changed course.  CMS sent the State a letter that, by its terms and timing, informed the State that it would no longer fund

Florida's LIP program unless and until the State agreed to expand its Medicaid program. In doing so, CMS did not even mention, let alone attempt to reconcile its position with, the State's repeated and undisputed showings that the LIP program and Medicaid expansion make care available to different populations, have different goals, and pay for healthcare services through different channels.

8.     CMS's eleventh-hour refusal to fund the LIP program has put Florida in an impossible position.  Come June 30, the fiscal year will end in Florida and LIP funding will run dry.  And without federal approval and the anticipated $1.3 billion in federal funding, it is exceedingly unlikely that the LIP program can continue at all.  Without LIP, healthcare providers could face more than $1 billion in uncompensated care.  Children's hospitals in Florida will lose $125 million in funding, again for care that would not be covered by Medicaid expansion.  Medical schools, which rely on clinical services to train the next generation of Florida doctors, will lose $200 million in funding to offset those costs.  And all of this solely because Florida has exercised its constitutional prerogative not to opt into Medicaid expansion.

9.     CMS's strong-arm tactics are not confined to Florida.  CMS has levied the same coercive threat at other States that have declined to adopt Medicaid expansion. Like Florida, these States have been warned:  opt into Medicaid expansion now or lose hundreds of millions in unrelated federal healthcare funding.  In these States as well, there can be no serious dispute that CMS is using vital healthcare funds as its trump card to bring about its preferred policy choice of Medicaid expansion.

10.     The Constitution protects the integrity, dignity, and residual sovereignty of the States by, among other things, ensuring that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."   U.S. Const. amend. X.   The same constitutional protections that dictate that the "Federal Government may not compel the States to enact or administer a federal regulatory program," *New York v. United States*, 505 U.S. 144, 188 (1992); *see also Printz v. United States*, 521 U.S. 898, 925-26 (1997), also prohibit the federal government from achieving the same end by using its spending power to hold "a gun to the head" of a State.  *NFIB*, 132 S. Ct. at 2604 (plurality op.); *see also South Dakota v. Dole*, 483 U.S. 203, 211 (1987).  The federal government cannot coerce States into expanding their Medicaid programs by "penaliz[ing] States that choose not to participate in that new program by taking away their existing Medicaid funding."  *NFIB*, 132 S. Ct. at 2607.  Because that is precisely what the federal government is attempting to do here, Florida seeks this Court's immediate intervention and relief.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper under 28 U.S.C. §1331 because this case arises under the Constitution and laws of the United States.

12.     Plaintiffs allege violations of the Administrative Procedure Act, which permits "person[s] suffering legal wrong because of agency action" to seek non-monetary relief against the United States, the agency, or its appropriate officer in this Court.  5 U.S.C. §§702, 703.

13.    This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§2201, 2202.

14.    Venue is proper in this judicial district under 28 U.S.C. §1391(e) because, among other reasons, the plaintiffs reside in the district and no real property is involved in this action against the agency and officers thereof.

## PARTIES

15.    Plaintiff Rick Scott is the Governor of Florida.  The Florida Constitution vests the Governor with overseeing all state agencies as well as signing into law and executing the state budget and any other laws enacted by the Florida Legislature.

16.    Plaintiff the State of Florida, by and through Pamela Jo Bondi, Attorney General of Florida, is a sovereign State in the United States of America.

17.    Plaintiff Agency for Health Care Administration ("AHCA") is the chief health policy and planning agency within the State of Florida.  The agency coordinates the State's Medicaid program, licenses health care facilities, collects and analyzes health care access data, and ensures access to health care for residents through other funding programs, including the Low Income Pool program.

18.    Defendant United States Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the administration and enforcement of the Social Security Act.  It oversees the Center for Medicare and Medicaid Services and is responsible for the actions of that agency and its officers.

19.    Defendant Sylvia Burwell is the Secretary of HHS and is named as a party in her official capacity.

20.     Defendant Centers for Medicare and Medicaid Services ("CMS") is responsible for the administration and enforcement of the Social Security Act.   It approves and disburses funding for section 1115 waiver programs, 42 U.S.C. §1315, including the Florida LIP program.

21.     Defendant Andy Slavitt is the Acting Administrator for CMS and is named as a party in his official capacity.

## FACTS

## I.     MEDICAID AND THE AFFORDABLE CARE ACT

22.     Medicaid is a cooperative federal-state partnership through which States receive federal funding in exchange for agreeing to pay for certain types of medical services for specific populations, including pregnant women, disabled adults, and children living near or below the poverty level.   42 U.S.C. §1396 *et seq.*   Each State crafts its own Medicaid program, which must cover certain populations and services under federal law, but coverage for others is optional.   Each State's program identifies the populations and services that the State will cover.   *Id.* §1396a.

23.     In addition to the basic Medicaid program, Congress also has authorized the creation of "waiver" programs that enable federal-state partnerships outside the contours of Medicaid.   That is, the Act authorizes the Secretary of HHS to "waive" existing statutory requirements to permit federal-state partnerships to fund coverage of certain populations or for certain services that would not otherwise be eligible for federal Medicaid funding.   The annual amount of federal Medicaid funding each State receives

reflects funding both for the State's basic Medicaid program and for any "waiver" programs the State may have.

24.     Through the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), Congress amended the Medicaid statute to require States to cover all individuals under the age of 65 with income levels below 133% of the federal poverty level, with a 5% income disregard provision.  *See* ACA §2001(a), 124 Stat. 271-72; ACA §2002(a), 124 Stat. at 279-82.  The ACA made this significant expansion of Medicaid a condition of continued participation in any aspect of Medicaid, thereby threatening States with the loss of hundreds of millions or, in many cases, billions of dollars in federal funding should they decline to expand their Medicaid programs in accordance with the ACA's new requirements.

25.     In *NFIB*, the Supreme Court agreed with Florida and 25 other States that the ACA's blatant attempt to coerce States into expanding their Medicaid programs through the threatened withholding of massive amounts of preexisting federal Medicaid funding violates the Constitution.  As the Court explained, "[w]hen … conditions" attached to federal funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the States to accept policy changes," in violation of the Constitution.  *NFIB*, 132 S. Ct. at 2604 (plurality op.).

26.     As a result of that holding, the Court concluded that while "[n]othing … precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, … Congress is not free to … penalize States that choose not to

participate in that new program by taking away their existing Medicaid funding."  *Id.* at 2607.

## II.    FLORIDA'S LIP PROGRAM

27.    Although Florida has not elected to opt into the expansion program created by the ACA, it has long been, and continues to be, a participant in traditional Medicaid.  Florida spent about $20 billion on Medicaid programs in 2013, more than $12 billion of which came from federal funding.

28.    Since 2006, a significant amount of Florida's federal Medicaid funding has been dedicated to funding Florida's Low Income Pool, or "LIP," program.

29.    The LIP program is part of a section 1115 waiver program.  That section 1115 waiver program creates a federal-state partnership, which combines federal and local dollars to cover populations and services that would not otherwise be covered by Medicaid.  By statute, a section 1115 waiver program involves both a *demonstration*—a hypothesis of what healthcare goals the State is trying to accomplish that could not otherwise be accomplished through Medicaid—and an *evaluation*—an independent review of how well the program met that hypothesis.  The program must be budget neutral, *i.e.*, must result in lesser expenditures than would be expended without it.  42 U.S.C. §1315.

30.    CMS first approved Florida's LIP program in 2005 as part and parcel of a section 1115 waiver program initially known as "Medicaid Reform."  CMS approved the LIP program at a total cost of $1 billion a year and agreed to provide federal funding to cover roughly 60% of that total cost.  In 2011, Florida and CMS agreed to extend LIP for

another three years, again at a total cost of $1 billion annually, and again with an approximately 60% federal match.

31.     Florida's LIP program operates principally by providing quarterly, lump-sum payments to healthcare providers that provide uncompensated or undercompensated care to uninsured and underinsured populations as well as other free care.  Through these lump-sum payments, Florida is able to provide additional support to safety net hospitals, rural hospitals, trauma centers, and other providers that serve low-income or other populations whose care would not otherwise be covered by Medicaid.

32.     To date, nearly all of the State's share of funding for the LIP program has come from local governmental entities, such as counties or hospital taxing districts, that contribute to the program to support their local healthcare providers.  Generally, those local dollars are matched by the federal government and returned to the local jurisdictions.  The millions of dollars put into the program by Miami-Dade County, for example, are supplemented by federal dollars and then returned to the County as an investment in their local health infrastructure, including safety-net hospitals such as Jackson Memorial Hospital.  Because of these federal-local partnerships, localities in the State with greater need for subsidized healthcare services contribute more to the LIP program and receive more in return.

33.     Florida is not alone in receiving significant federal funding through an uncompensated care pool made possible through a waiver program.  All States operate one or more Medicaid waiver programs, and several other States, including Texas,

Arizona, California, Kansas, and Tennessee, have developed programs similar to Florida's LIP program.

34.    While historically some of the uncompensated or undercompensated care provided by recipients of LIP funds in Florida has been for services provided to patients who would be covered by Medicaid if the State were to opt into the ACA's expansion, much of the care is not.  For instance, immigrants who have been in the United States for fewer than five years are generally ineligible for Medicaid even if they are living at or below the poverty line. 8 U.S.C. §1611.  Many of these individuals therefore would remain uninsured or underinsured, and their uncompensated care would remain ineligible for reimbursement through Medicaid, if Florida opted into expansion.  Accordingly, without the LIP program, Florida would have no means of helping hospitals offset the substantial costs of providing this uncompensated care.

35.    That is but one of several examples of uncompensated care costs that would continue in Florida with or without Medicaid expansion.  In 2012, the Urban Institute conducted a 50-state survey comparing the expected cost of uncompensated care with and without Medicaid expansion.  That study concluded that $1.6 billion in uncompensated care costs would persist in Florida even if the State opted into the ACA's expansion.  Fredric Blavin, *at al.*, *State Progress Toward Health Reform Implementation: Slower Moving States Have Much to Gain* 7 (Urban Inst. 2012).  Those sorts of costs are precisely what Florida—with the long-time approval and support of the federal government—has developed its LIP program to address.

11

36.     Over time, Florida (again, with the federal government's approval) also has expanded its LIP program to provide financial support to hospitals that face higher costs for reasons other than providing uncompensated care.  For instance, Florida uses the LIP program to support public and private medical schools and their teaching hospitals, which face certain inherent inefficiencies due to slower patient turnover and other costs of training medical students.  An expanded Medicaid program, of course, would have no effect on these supplemental payments to medical schools.

37.     These schools and hospitals have come to rely on this supplemental funding as a means of helping them provide services to all populations while also performing the vital but expensive function of teaching Florida's next generation of doctors.  These funds are particularly critical, for example, for the University of Miami Hospital, a private institution that otherwise would not be able to receive additional Medicaid funding in the same way a public institution could.

38.     Florida's children's hospitals likewise receive $125 million annually in LIP funding to offset the cost of serving all children in Florida, often at a reduced cost.

39.     As with the more than one billion in uncompensated care costs, the costs that LIP funding helps offset for these healthcare providers would persist even if Florida opted into Medicaid expansion.

**III.    NEGOTIATIONS FOR LIP FUNDING FOR 2014 AND 2015**

40.    With the three-year extension of the original approval for the LIP program set to expire on July 30, 2014, Florida and CMS began negotiations for another extension in 2013.  These efforts were undertaken in conjunction with broader negotiations for the extension of funding for the waiver program formerly known as "Medicaid Reform," which Florida shifted from a fee-for-service program to a managed care program and renamed the "Managed Medical Assistance Program" (MMA) in 2013.

41.    On April 11, 2014, Florida and CMS arrived at an agreement in principle that the federal government would continue to fund the LIP program through June 30, 2015.  Specifically, CMS agreed to provide approximately $1.3 billion in federal funding to help fund a LIP program costing a total of $2.167 billion.  Of that $2.167 billion, roughly $1.9 billion was designated for healthcare providers and more than $200 million was earmarked for medical schools.

42.    On July 31, 2014, CMS issued a letter memorializing its agreement to fund the LIP program through June 30, 2015, but voicing concerns about the current structure of the program.  In particular, CMS expressed the need for measures to strengthen oversight of LIP expenditures and to ensure that payments to providers through LIP represent only allowable costs.  To that end, CMS ordered the State to commission an independent report to review the adequacy, equity, accountability, and sustainability of Medicaid provider payments in Florida and to recommend reforms.

43.    To respond to these concerns, the State commissioned an independent report by Navigant that studied hospital funding and payment mechanisms for Florida's

Medicaid programs.  The Navigant report found that the LIP program could benefit from greater oversight and transparency of funding, but advised that efforts to address those concerns could be easily and quickly implemented (*e.g.*, by adding to the already-existing AHCA reports an analysis of claim payments and supplemental payments at a hospital level).

44.    The Navigant report also analyzed whether LIP funding would remain necessary if Florida were to opt into the ACA's Medicaid expansion, and concluded that it would.  As the report explained, since its inception, the LIP program has served the critical role of funding "the gap" in care not eligible for compensation through Medicaid. Like the Urban Institute, Navigant concluded that although some of that gap is attributable to individuals whose care would be covered by Medicaid expansion, much of it is not.  The report also explained that LIP funding serves other vital functions, including funding Florida's teaching hospitals, children's hospitals, county health departments, and federally qualified health clinics.  The report thus concluded that, even with Medicaid expansion, the "expiration of the LIP program without any sort of replacement ... would be enough to create financial hardship for hospitals, particularly those with a high utilization from Medicaid and uninsured patients."  Navigant, *Study of Hospital Funding and Payment Methodologies for Florida Medicaid* 28 (2015).

45.    In light of these and other findings, Navigant concluded that CMS should continue to approve and fund a modified version of LIP whether or not Florida opts into Medicaid expansion.

46. After receiving Navigant's initial report on January 15, 2015, the State immediately began negotiations with CMS regarding how to modify the LIP program to address each of the concerns CMS had raised. As with past negotiations, CMS stated that no formal proposal needed to be submitted and that negotiations would be informal.

47. At every stage of those negotiations, the State made clear that it needed to obtain an agreement in principle by mid-April, so that the Florida Legislature could comply with its obligation to pass a budget by May 1. And at every stage, CMS stated that it was aware of and hoped to meet that deadline by informing Florida of CMS's intent for the size, scope, and parameters of the LIP program by mid-April.

48. Throughout these negotiations, the State sought answers to three questions that would guide its understanding of the future of the LIP program: (1) would CMS continue to allow the State to support its healthcare providers with an uncompensated care pool; (2) if so, how could that uncompensated care pool be tailored so that it would not substitute for or duplicate funding available through Medicaid expansion; and (3) what additional accountability and transparency measures could the State add to its program to address CMS's concerns.

49. Without a clear answer to any one of those questions, the State forged ahead, supplying CMS with different proposals to address what the State understood to be CMS's concerns, and at all times reiterating that the parties must arrive at an agreement in principle by mid-April.

50. In making each of these proposals, the State also volunteered to tailor the size of the LIP program so that it would not cover any uncompensated care costs

attributable to services and populations that would be covered by Medicaid should Florida agree to expand.  In other words, even though *NFIB* held that the federal government may not condition preexisting Medicaid funding on a State's decision to expand, Florida nonetheless agreed to modify the size and scope of its LIP program so that it would in no respects serve as an alternative means of covering the same services already eligible for federal funding under the ACA's expansion.

51.     In March, the State supplied CMS with different scenarios as a starting point for modifying the size and scope of the LIP program.  Those scenarios distributed more than $2 billion in funds for hospitals, made available by contributions from local governmental entities and hospitals that are matched with federal dollars, in four different ways.  During informal meetings, the State discussed with CMS how each scenario would change the size and scope of the LIP to address CMS's concerns.

52.     On March 26, the State supplied CMS with yet another proposal crafted by the state Senate.  That proposal included a modification that would enable LIP funds to be distributed more broadly across the State.  It acknowledged concerns about transparency and agreed that enhanced reporting and oversight measures would improve transparency going forward.  It also maintained funding for Florida's medical schools, health departments, federally qualified health centers, and other providers not otherwise eligible for traditional Medicaid funding.  The State again reiterated that it must have an agreement in principle regarding the future size and scope of the LIP program by mid-April.

53.     In early April, the State attempted to continue substantive negotiations with CMS, but CMS informed the State that it would not be available until mid-April for any further meetings, thus making it almost certain that the State would have no agreement in principle with ample time for the Legislature to craft its budget.

54.     CMS then abruptly cut off negotiations.  CMS stated it had all the information it needed to make a determination about the future of the LIP program and that there was no need for any additional negotiations.

55.     On April 14, 2015—two weeks after negotiations ceased and mere weeks before the State's budget was due—CMS sent the State a letter that, by its terms and timing, stated it would no longer fund the LIP program unless the State agreed to opt into the ACA's Medicaid expansion.  In that letter, CMS took the position that "the future of the LIP, sufficient provider rates, and Medicaid expansion are linked in considering a solution for Florida's low income citizens, safety net providers, and taxpayers," and that "coverage rather than uncompensated care pools is the best way to secure affordable access to health care for low-income individuals."  The CMS letter also asserted that "uncompensated care pool funding should not pay for costs that would be covered in a Medicaid expansion," yet made no mention of the fact that the State had unequivocally expressed its willingness to tailor the size of its LIP program to eliminate that potential overlap.

56.     On that same date, six members of Congress from the Florida delegation wrote to CMS reiterating the unrebutted findings that $1.6 billion in uncompensated care would continue to exist in Florida with or without Medicaid expansion, and that LIP

funding remains a vital tool for offsetting the costs of that care. The letter also reminded CMS that, under the Supreme Court's decision in *NFIB*, it may not attempt to coerce Florida into adopting Medicaid expansion by withholding funding for other unrelated programs.

57. On April 15, 2015, AHCA sent CMS a letter that likewise reiterated that, both as a practical matter and as a constitutional matter, "the LIP program is separate and apart from any decision to expand Medicaid." As the letter explained, CMS's effort to "clearly link[] a continued LIP with Medicaid expansion" conflicts with the Supreme Court's decision in *NFIB*, which "explicitly warned the federal government against attempting to coerce states into participating in Medicaid expansion." AHCA also clarified that it does not have the power under state law to adopt Medicaid expansion and that its only role is to "focus on LIP and its features going forward."

58. In its April 15, 2015 letter, AHCA also reiterated that it has proposed multiple models to address all of the concerns raised by CMS. AHCA also once again reminded CMS that Medicaid expansion would still leave Florida with more than $1 billion in uncompensated care, and would potentially force hundreds of thousands of Floridians off of private insurance plans purchased on the federal exchange and onto Medicaid. For those and other reasons, AHCA stated that it would be immediately resubmitting its proposal, and that CMS is constitutionally required to consider that proposal without regard to Florida's decision not to opt into Medicaid expansion.

59. On April 20, 2015, AHCA resubmitted to CMS a summary of the same proposal crafted by the state Senate that it had submitted on March 26. As before, the

goal of this proposal is to make clear that LIP funding will not be used to cover costs that would be covered by the ACA should Florida agree to opt into the Medicaid expansion.

60.     To date, CMS has not responded to the State's resubmitted proposal, and no statutory or regulatory provision requires it to do so.

61.     According to an April 21, 2015 report from the Kaiser Family Foundation, CMS also has threatened Texas, Kansas, and Tennessee with the loss of funding for their similar LIP programs unless and until they agree to opt into Medicaid expansion.

## IV.     IMMINENT DEADLINES FOR THE FLORIDA BUDGET & LIP EXPIRATION

62.     The regular session of the Florida Legislature ends on Friday, May 1, 2015.  By then, the Legislature must pass the one constitutionally required bill it must pass each session: the state budget.  Not since 1992 has Florida failed to pass a state budget during the regular session.  Failure to pass the budget by May 1 would require the Legislature to take the extraordinary measure of extending the regular session, or the even more extraordinary measure of holding a special session.  Come June 30, the fiscal year comes to an end and the current LIP funding expires.

63.     Because CMS has failed to provide the State with an agreement in principle to fund its LIP program, the Legislature must now cope with the loss of a critical $2.2 billion cooperative federal-state program on which healthcare providers rely.  There is no feasible way for the State to replicate the LIP program without those federal funds.  The local governmental entities and hospitals that currently contribute to LIP rely on those federal matching funds for a guaranteed return on their investment.  Without that incentive, it is highly unlikely that those localities would continue to contribute.

Accordingly, Florida is bracing for a $2.2 billion hit to its healthcare providers for no apparent reason other than because it has not agreed to accede to the federal government's demand to expand its Medicaid program.

64.     In light of this substantial and imminent constitutional injury, Florida is left with no choice but to seek immediate judicial relief, either through this Complaint or through the Petition for Mandamus that is being filed in conjunction with it.

## COUNT I

**DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706(2)**

65.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 64, above.

66.     The Administrative Procedure Act ("APA") permits anyone who has "suffer[ed] legal wrong" because of final agency action to seek judicial review.  5 U.S.C. §702.  The APA requires a reviewing court to set aside any agency action that is unconstitutional, unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* §706(2).

67.     The April 14, 2015 letter from CMS to AHCA constitutes final agency action subject to review under the APA.  The letter, by its terms and timing, conclusively establishes Medicaid expansion as a condition for the receipt of LIP funding and conclusively rejects Florida's request to continue funding its LIP program unless and until Florida agrees to adopt the ACA's Medicaid expansion.  There are no procedures set out in federal statute or regulations to administratively contest the establishment of *ultra vires* conditions on federal funding or the denial of section 1115 waiver program funds.

68.     The Constitution protects the integrity, dignity, and residual sovereignty of the States by, among other things, ensuring that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. Const. amend. X.  As the Supreme Court held in *NFIB*, the same constitutional protections that dictate that the "Federal Government may not compel the States to enact or administer a federal regulatory program," *New York v. United States*, 505 U.S. 144, 188 (1992); *see also Printz v. United States*, 521 U.S. 898, 925-26 (1997), also prohibit the federal government from achieving the same end by using its spending power to hold "a gun to the head" of a State.  *NFIB*, 132 S. Ct. at 2604; *see also South Dakota v. Dole*, 483 U.S. 203, 211 (1987).   More specifically, the Constitution prevents the federal government from trying to coerce States into expanding their Medicaid programs by "penaliz[ing] States that choose not to participate in that new program by taking away their existing Medicaid funding."  *NFIB*, 132 S. Ct. at 2607.

69.     CMS's unambiguous attempt to condition the continued federal funding of Florida's LIP program on Florida's agreement to opt into Medicaid expansion constitutes impermissible coercion in violation of the Constitution, and otherwise violates the APA.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully prays for the following relief:

1.     declaratory relief stating that Defendants violated the Constitution and the APA by withholding federal funding for Florida's LIP program unless and until Florida agrees to expand its Medicaid program;

2.      injunctive relief prohibiting Defendants from tying their decision whether to provide federal funding for Florida's LIP program to Florida's decision whether to opt into Medicaid expansion;

3.      injunctive relief compelling Defendants to immediately reconsider the renewal of Florida's LIP program without taking into consideration Florida's decision whether to opt into Medicaid expansion;

4.      costs and attorneys' fees pursuant to any applicable statute or authority; and

5.      any other relief this Court deems just and appropriate.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

PAUL D. CLEMENT
  (motion for admission submitted)
ERIN E. MURPHY
  (motion for admission submitted)
BARBARA SMITH GRIECO
  (motion for admission submitted)
TAYLOR A.R. MEEHAN
  (motion for admission submitted)
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036-9801
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com

*/s/ Allen Winsor*
ALLEN WINSOR (FBN 16295)
*Solicitor General*
Office of the Attorney General
The Capitol - PL-01
Tallahassee, Florida 32399-1050
*allen.winsor@myfloridalegal.com*
(850) 414-3300
(850) 410-2672 (fax)

*Counsel for Plaintiffs*

April 28, 2015

22