**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| RICK SCOTT, in his official capacity as Governor of Florida; STATE OF FLORIDA, by and through PAMELA JO BONDI, in her official capacity as Attorney General of the State of Florida; AGENCY FOR HEALTH CARE ADMINISTRATION, )<br><br>*Plaintiffs-Petitioners*, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SYLVIA BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; ANDY SLAVITT, in his official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services, )<br><br>*Defendants-Respondents*. ) | Nos. 3:15-cv-00193-RS-CJK,<br>3:15-cv-00195-RS-CJK |

---

**PLAINTIFFS-PETITIONERS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE,
PETITION FOR A WRIT OF MANDAMUS**

PAMELA JO BONDI
ATTORNEY GENERAL OF FLORIDA
ALLEN WINSOR
SOLICITOR GENERAL OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3688
Facsimile: (850) 410-2672
allen.winsor@myfloridalegal.com

PAUL D. CLEMENT
ERIN E. MURPHY
BARBARA SMITH GRIECO
TAYLOR A.R. MEEHAN
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com

*Counsel for Plaintiffs-Petitioners*

May 7, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .........................................................................................................1

STATEMENT OF FACTS .............................................................................................2

    A.    Medicaid And The Affordable Care Act ......................................................2

    B.    Florida's LIP Program ...............................................................................4

    C.    The 2015 LIP Funding Negotiations ..........................................................9

STANDARDS OF REVIEW .........................................................................................13

ARGUMENT AND CITATION OF AUTHORITIES ...................................................14

I.    CMS's Attempt To Condition Continued Funding Of
Florida's LIP Program On Opting Into Medicaid Expansion Constitutes
Unconstitutional Coercion. ....................................................................................15

II.    The State Will Be Irreparably Harmed Absent
Immediate Relief.....................................................................................................20

III.    Immediate Relief To Alleviate Irreparable Harm To
The State Will Cause The Agency No Unnecessary
Harm Or Disruption. ...............................................................................................24

IV.    The Public Interest Weighs In Favor Of Immediate Relief. ...............................25

CONCLUSION............................................................................................................25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n,*
543 F.2d 356 (D.C. Cir. 1976)...................................................................... 13

*Bond v. United States,*
131 S. Ct. 2355 (2011) ............................................................................... 15

*Ciba-Geigy Corp. v. EPA,*
801 F.2d 430 (D.C. Cir. 1986)...................................................................... 13

*F.T.C. v. Dean Foods Co.,*
384 U.S. 597 (1966)..................................................................................... 22

*KH Outdoor, LLC v. City of Trussville,*
458 F.3d 1261 (11th Cir. 2006) ............................................................. 24, 25

*Massachusetts v. United States,*
435 U.S. 444 (1978)..................................................................................... 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius,* 132 S. Ct. 2566 (2012) ................................. *passim*

*New York v. United States,*
505 U.S. 144 (1992)..................................................................................... 15

*Palmer v. Braun,*
287 F.3d 1325 (11th Cir. 2002) .................................................................... 13

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981)......................................................................................... 20

*Printz v. United States,*
521 U.S. 898 (1997)..................................................................................... 15

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
489 F.3d 1279 (D.C. Cir. 2007)..................................................................... 23

*S&R Corp. v. Jiffy Lube Int'l, Inc.,*
968 F.2d 371 (3d Cir. 1992) ........................................................................ 24

*South Dakota v. Dole,*
483 U.S. 203 (1987)..................................................................................... 16

*Steward Machine Co. v. Davis,*
    301 U.S. 548 (1937) ............................................................ 16

*U.S. Dep't of Educ. v. Riley,*
    23 F.3d 80 (4th Cir. 1994) .................................................. 22

*V.N.A. of Greater Tift Cnty., Inc. v. Heckler,*
    711 F.2d 1029 (11th Cir. 1983) .......................................... 14

**Statutes**

42 U.S.C. §1315 ..................................................................... 4

42 U.S.C. §1315(f)(6) ............................................................ 4

42 U.S.C. §1396a(a) ............................................................... 2

42 U.S.C. §1396a(a)(10) ........................................................ 2

42 U.S.C. §1396d(y)(1) .......................................................... 3

Fla. Stat. §409.91211(1)(c) ................................................... 5

Patient Protection and Affordable Care Act, Pub. L. No. 111-148,
    §2001(a), 124 Stat. 119, 271-72 (2010) ............................ 3

Patient Protection and Affordable Care Act, Pub. L. No. 111-148,
    §2002(a), 124 Stat. 119, 279-82 (2010) ............................ 3

**Other Authorities**

Hearing of the Senate Ethics and Elections Committee of the Florida
    Legislature (Apr. 15, 2015), http://perma.cc/x3k4-wc9l ............. 21

Kaiser Family Found., *Total Medicaid Spending FY 2013,*
    http://perma.cc/4sf6-2n2q .................................................. 6

Letter from Members of Congress to Andy Slavitt, Acting Adm'r of CMS
    (Apr. 14, 2015), http://perma.cc/2txr-fthl ......................... 12

Medicaid.gov, *Section 1115 Demonstrations,* http://perma.cc/75qr-8rnz ............. 4

Phil Galewitz, *Tennessee, Kansas Also Get Warnings: Expand Medicaid or
    Risk Hospital Funds,* Kaiser Health News (Apr. 21, 2015),
    http://perma.cc/a89t-mmla ................................................. 23

# INTRODUCTION

In its landmark decision in *National Federation of Independent Business v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566, 2607 (2012), the Supreme Court held that the federal government may not threaten to withhold preexisting Medicaid funding to coerce States to expand their Medicaid programs in the manner that the Affordable Care Act ("ACA") envisions. Yet not three years later, the federal government is at it again.

Just before the Florida Legislature's constitutionally mandated responsibility to pass a balanced budget was due, the federal government informed the State that it would be withholding more than $1 billion in federal funding for a critical, longstanding Medicaid waiver program unless Florida agrees to participate in the ACA's Medicaid expansion. To make matters worse, the federal government imposed this condition even though the State voluntarily agreed to tailor its waiver program to eliminate any potential overlap with the ACA's Medicaid expansion. Accordingly, once again, the federal government is knowingly and deliberately attempting to coerce Florida into participating in Medicaid expansion by withholding massive amounts of preexisting Medicaid funding if it refuses. Just like last time, the federal government's actions are unconstitutional.

Unless this unconstitutional coercion is redressed, it will have immediate and devastating consequences for Florida, its healthcare providers, and its residents. The $2.2 billion in total healthcare funding made possible by the waiver program is critical to ensuring that the State's healthcare providers are able to continue providing care for individuals and services that are not otherwise provided by Medicaid, even as expanded by the ACA. The program also provides vital funding to offset the cost of care provided by

medical schools, community health clinics, and county health departments—funding that once again is not otherwise available under Medicaid or the ACA. As a practical matter, the loss of more than $1 billion in federal funding will spell the end of this program, all because Florida has exercised its constitutional prerogative not to participate in Medicaid expansion.

The impending June 30 expiration date for existing federal funding leaves the State and its healthcare providers with little choice but to start taking irreversible actions now to cope with the loss of federal funds that are being withheld for impermissible reasons. Accordingly, if the federal government is not forced to eliminate its unconstitutional and coercive condition and reconsider its waiver funding determination untainted by that *ultra vires* condition immediately, any relief this Court provides may come too late. In short, Florida needs judicial relief, and it needs that relief now. This court should grant the State's motion for a preliminary injunction or, in the alternative, its petition for a writ of mandamus, and prohibit the federal government from again leveling the same coercive threats that the Supreme Court has already held unconstitutional.

## STATEMENT OF FACTS

### A.     Medicaid And The Affordable Care Act

Medicaid is a cooperative federal-state program through which the federal government has agreed to cover at least 50 percent of the costs for any State willing to pay for medical care for needy individuals. 42 U.S.C. §1396a(a)(10). Although any State that participates in Medicaid must cover certain populations and services, *id.* §1396a(a), Congress also has created mechanisms through which States can receive federal funding to cover additional individuals and services, including by obtaining from the federal

government permission to "waive" some of the statutory restrictions built into Medicaid. Total Medicaid expenditures account for a massive portion of most state budgets; they have topped roughly 30 percent of Florida's total expenditures for each of the past five years. *See, e.g.*, Navigant Healthcare, *Study of Hosp. Funding and Payment Methodologies for Fla.* 74 (2015) ("Navigant Report") (Exh.3). On average, more than 10 percent of each State's total revenue comes from federal Medicaid funding. *NFIB*, 132 S. Ct. at 2581.

In 2010, Congress set out to expand the population and services covered by Medicaid. Through the Patient Protection and Affordable Care Act of 2010, it amended the Medicaid statute to require States to cover all individuals under age 65 living at or below 133 percent of the federal poverty level, with a 5 percent income disregard. Pub. L. No. 111-148, §§2001(a), 2002(a), 124 Stat. 119, 271-72, 279-82. This marked a dramatic expansion in the Medicaid program; before the ACA, most States covered no childless adults and covered both unemployed and employed parents at much lower levels. *See NFIB*, 132 S. Ct. at 2601 (plurality op.). The federal government agreed to pay for this expansion through 2016, but would gradually increase each State's share of this $100 billion in new Medicaid spending in each of the next few years, until States hit 10 percent in 2020. *See* 42 U.S.C. §1396d(y)(1). Any State that did not agree to bear the financial risk of expanding its existing Medicaid program would stand to lose not merely the additional funds available under the ACA, but *all* existing federal Medicaid funding. *NFIB*, 132 S. Ct. at 2604 (plurality op.).

Joined by 25 other States, Florida challenged this blatant attempt to force States to expand their Medicaid programs by denying preexisting, unrelated Medicaid funding. In

*NFIB*, the Supreme Court agreed with the challenging States that the federal government's actions were unconstitutionally coercive. As the Court held, while the federal government is free to "offer[] funds under the Affordable Care Act to expand the availability of health care, and require[] that States accepting such funds comply with the conditions on their use," it is "not free ... to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding." *Id.* at 2607.

**B.      Florida's LIP Program**

Although Florida has not elected to expand its Medicaid program under the ACA, its Medicaid plan is nevertheless substantial in scope. In 2013, Florida spent roughly $20 billion on Medicaid, more than $12 billion of which came from federal funding. Like every other State, Florida's Medicaid plan includes both funding for core Medicaid as well as funding for various "waiver" programs. The waiver program at the center of this dispute is Florida's Low Income Pool ("LIP") program, which is part of a section 1115 waiver program. 42 U.S.C. §1315. As described by CMS, section 1115 waivers "give States additional flexibility" to cover healthcare services for vulnerable residents by enabling the States "to demonstrate and evaluate policy approaches," including "[e]xpanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible," "[p]roviding services not typically covered by Medicaid," or "[u]sing innovative service delivery systems that improve care, increase efficiency, and reduce costs." Medicaid.gov, *Section 1115 Demonstrations*, http://perma.cc/75qr-8rnz. Each section 1115 waiver is initially approved for up to five years, with extensions of up to three years available thereafter. 42 U.S.C. §1315(f)(6).

Florida's LIP program is a component of a larger section 1115 waiver program currently known as the Managed Medical Assistance Program. *Pub. Notice Document: Low Income Pool Amendment Request* ("Public Notice") 3 (2015) (Exh.5).[1] The LIP program seeks to "provide government support for safety net hospitals that furnish health care to the Medicaid, underinsured and uninsured populations." Navigant Report 32. The program is designed to "establish new, or enhance existing, innovative programs that meaningfully enhance the quality of care and the health of low income populations." *Id.*; *see also* Fla. Stat. §409.91211(1)(c) (describing LIP goals). To that end, the program makes quarterly, lump-sum payments to Florida's hospitals, children's hospitals, medical schools, county health departments, and federally qualified health clinics. Those payments supplement, rather than substitute for, funding otherwise available through Medicaid, which often comes up short in reimbursing healthcare providers for the actual costs of the care they provide. Indeed, a key goal of the LIP program is to make these quarterly, lump-sum payments available to healthcare providers incurring costs not otherwise reimbursable by Medicaid, whether in its pre-ACA or its expanded form.

To take just one example, Jackson Memorial Hospital, which has long served as a safety-net hospital and trauma center in urban Miami, expects to receive about $520 million in LIP funding in fiscal year 2014/2015. *Medicaid Hosp. Funding Programs* ("Senate Proposal") 36 (Exh.6). Likewise, free-standing children's hospitals—offering care for

---

[1] This program was previously known as "Medicaid Reform" but was renamed in 2014 when Florida finalized its shift from a fee-for-service payment model to a managed care payment model, made possible by the section 1115 waiver. Public Notice 3.

severely ill or injured children that other hospitals do not offer—receive roughly $125 million to offset the cost of that specialty care. Letter from Justin Senior, Deputy Sec'y of Medicaid, to Victoria Wachino, Acting Dir. of CMS ("AHCA Letter") 1 (Apr. 15, 2015) (Exh.2). Medical schools currently receive more than $204 million—tens of thousands of dollars per medical resident—through LIP to pay for the cost of training the next generation of Florida doctors. Navigant Report 190. Most of these costs are not otherwise fully compensable by Medicaid, whether in its pre-ACA or its expanded form.

CMS has approved Florida's LIP program on three separate occasions going back well before the enactment of the ACA—for a five-year period in 2005, a three-year period in 2011, and a one-year period in 2014. Public Notice 3. For the first eight years of its existence, the program cost $1 billion a year, of which federal funding covered approximately 60 percent. In 2014, the cost of the LIP program increased to $2.167 billion, thus exceeding total 2013 Medicaid spending in 13 States and rivaling it in 5 more.[2] The federal government provided Florida with $1.3 billion in LIP funds in 2014, including approximately $728 million for the State's 23 public hospitals and $577 million for the State's 190 privately owned hospitals. Navigant Report 209. These federal LIP funds are "matched" with state-generated funds, all but roughly 2 percent of which are local contributions from public hospitals, county governments, taxing districts, and other local sources. *Id.* at 174-75. Accordingly, there is "almost no cost to the State associated with

---

[2] *See* Kaiser Family Found., *Total Medicaid Spending FY 2013*, http://perma.cc/4sf6-2n2q.

generating these federal matching funds." *Id.* at 209.[3]  These substantial sums are managed at the federal level by the Centers for Medicare and Medicaid Services ("CMS") and at the state level by Florida's Agency for Healthcare Administration ("AHCA").  Since the program's start in 2005, AHCA has overseen LIP spending and negotiated LIP renewals.

When CMS re-approved the LIP program in 2014, it rejected Florida's request to extend the program for another three years and instead agreed to only a one-year extension. CMS's stated reasons for the limited renewal were concerns about the "lack of transparency, encouragement toward overreliance on supplemental payments, and distribution of funds based on providers' access to local revenue instead of service to Medicaid patients." *See* Letter from Victoria Wachino, Acting Dir. of CMS to Justin Senior, Deputy Sec'y for Medicaid ("CMS Letter") 1 (Apr. 14, 2015) (Exh.1) (summarizing CMS's stated concerns from 2014).  CMS in no way foreclosed, however, the possibility of future extensions; to the contrary, it instructed the State to commission an independent report to review healthcare spending in Florida and study how the LIP program might be modified to address CMS's concerns.  Declaration of Justin M. Senior ¶5.  Taking the agency at its word, Florida commissioned the requested report from Navigant Health Care, an expert healthcare

---

[3] To incentivize these localities and hospitals to contribute to the LIP program, the program generally guarantees an 8.5 percent return.  The lion's share of that contribution, in addition to the 8.5 percent return financed in part by federal dollars, is then given back to those localities and hospitals to invest in their local healthcare providers.  Navigant Report 78.  The funds left over from these federally matched funds are used to provide additional payments to rural hospitals, trauma hospitals, safety-net hospitals, and hospitals offering specialty pediatrics care, to name a few.  Senate Proposal 65.

consultant, on the understanding that the report would aid in negotiating modifications to and a further extension of the LIP program. *See generally* Navigant Report (Exh.3).

The Navigant Report cataloged the history of both the LIP program and, more broadly, Florida's entire Medicaid program. Although the report identified some redundancies and inefficiencies in the LIP program, it concluded that the solution was not to scrap, but rather to revise, the program. The report unambiguously concluded that continued LIP funding was "critical" to ensure the continued availability of healthcare services for low-income populations, and also to provide unique support to medical schools and local healthcare providers at clinics and county health departments. Navigant Report 209; *see id.* at 201 ("It would simply not be realistic to expect the hospitals to absorb payment reductions that would have to occur if the LIP program were discontinued on June 30, 2015[.]"). Accordingly, the report encouraged a renewed LIP with greater oversight and increased transparency of the program's inner-workings at a granular level, and suggested several modifications that easily could be implemented by the next fiscal year. *Id.* at 201-02.

As part of its study, Navigant also examined whether opting into the ACA's Medicaid expansion would eliminate the need for LIP funding in Florida. *Id.* at 26-27. Although the report recognized that there is some overlap between LIP funding and funding available under the ACA, it concluded that a significant portion of LIP funding fills a gap that would continue to exist even if Florida were to opt into expansion. *Id.* at 27-28. That conclusion comports with an independent nationwide study by the Urban Institute of the effects of Medicaid expansion, which found that Florida would face $1.6 billion in uncompensated care even if it opted into Medicaid expansion. *See* Fredric Blavin, *et al.*,

Urban Inst., *State Progress Toward Health Reform Implementation: Slower Moving States Have Much to Gain* ("Urban Instit. Report") 7 (2012) (Exh.4). The Navigant Report thus concluded that CMS should continue funding the LIP program whether or not Florida opts into Medicaid expansion because "expiration of the LIP program without any sort of replacement ... would be enough to create financial hardship for hospitals, particularly those with a high utilization from Medicaid and uninsured patients." Navigant Report 29.

### C. The 2015 LIP Funding Negotiations

With the guidance provided by the Navigant Report, Florida and CMS proceeded to negotiate informally from January through March of this year. As it had in past years, CMS indicated that the State need not submit a formal application for LIP funding. Senior Decl. ¶8. Rather, CMS and the State would negotiate informally, with CMS expressing its concerns and the State proposing changes to meet those concerns. *Id*. Florida thus negotiated in good faith with CMS, on the understanding that LIP funding would continue if it could address the concerns identified by CMS. *Id.* ¶4. Also in line with past practice, the State informed CMS repeatedly that it would need at least an agreement in principle that CMS would fund LIP by early April, so that the Florida Legislature could pass its constitutionally required annual budget by May 1, 2015. *Id.* ¶8.

During these negotiations, the State acknowledged from the outset the existence of some overlap between the uncompensated care covered by LIP in its current form and the uncompensated care that would be covered if the State opted to expand Medicaid. And the State voluntarily agreed to modify the LIP program to ensure that it would no longer be used to offset any of those overlapping costs. In other words, the State was willing to size

LIP so that it would not duplicate or serve as a substitute for Medicaid expansion. But throughout the negotiations, there was no question that there was a substantial degree of non-overlap—*i.e.*, that LIP funding, even if narrowed, would meet a sizable financial need for healthcare providers across the State, separate and apart from that addressed by the Medicaid expansion envisioned by the ACA. Senior Decl. at ¶¶7, 16; *see* Navigant Report 27-28, 211; Urban Inst. Report 7. Consistent with the Navigant Report and the Urban Institute study, the State estimated that more than $1 billion in uncompensated care costs would persist in Florida even if the State were to opt into Medicaid expansion.

By March 2015, the State had supplied CMS with various options for a LIP program of different sizes. Senior Decl. at ¶12. The State voluntarily identified which it thought was best tailored to offset uncompensated care costs without duplicating or substituting for costs compensable by expanding Medicaid. In addition, the State later offered CMS another proposal, authored by the state Senate, that, among other things, would increase funding transparency and distribute LIP funding more equitably to needy areas. *See generally* Senate Proposal (Exh.6). At every stage, the State negotiated in good faith to reach an agreement in principle by early April that would determine the future size and scope of the LIP program. Despite that good faith effort and looming deadline, CMS notified Florida in the first week of April that it would not be available for any additional meetings for weeks. Senior Decl. ¶14. The State reiterated that the Florida Legislature was depending upon an agreement in principle, to which CMS responded that it needed no additional information from the State about its proposals to the LIP program—even though,

at least to Florida's knowledge, CMS had not made even the most basic decisions about whether (and, if so, in what form) the LIP program could continue. *Id.* ¶15.

After these communications between the State and CMS went dark, on April 14, 2015, CMS abruptly changed course and sent AHCA a letter informing it "that the future of the LIP, sufficient provider rates, and Medicaid expansion are linked in considering a solution for Florida's low income citizens, safety net providers, and taxpayers." CMS Letter 1. According to CMS, "coverage rather than uncompensated care pools is the best way to secure affordable access to health care for low-income individuals." *Id.* at 2. Apparently recognizing that AHCA lacks authority to expand Florida's Medicaid program on its own, CMS stated that it would be "monitor[ing] the progress of ... legislation closely" and that "the state's expansion status is an important consideration in [the agency's] approach regarding extending the LIP." *Id.* at 1. Although CMS insisted that "uncompensated care pool funding should not pay for costs that would be covered in a Medicaid expansion," *id.* at 2, the letter made no mention of the fact that the State already had agreed to tailor the LIP program to eliminate any such overlap.

Recognizing the disastrous consequences that would result from the termination of federal LIP funding, the State took immediate action. The next day, the State responded to CMS, summarizing what it had made clear all along: "[T]he LIP program is separate and apart from any decision to expand Medicaid." AHCA Letter 1. The letter explained that CMS's effort to "clearly link[] a continued LIP with Medicaid expansion" plainly contravenes *NFIB* and violates the Court's warning that the federal government may not

"coerce states into participating in Medicaid expansion." *Id.*[4] The letter further explained that two independent studies had confirmed the State's estimate that more than $1 billion in uncompensated care costs would persist even if the State were to bow to CMS's pressure and expand Medicaid. Six members of the Florida delegation to the United States Congress also wrote CMS, reiterating that the LIP program serves an essential need separate and distinct from Medicaid expansion, and reminding CMS that the Constitution and *NFIB* prohibit the federal government from attempting to coerce a State into Medicaid expansion by withholding federal funding for unrelated federal-state programs. Letter from Members of Congress to Andy Slavitt, Acting Adm'r of CMS ("Letter from Congress") (Apr. 14, 2015), http://perma.cc/2txr-fthl.

On April 20, 2015, AHCA followed up with CMS by resubmitting a public notice summarizing its proposal for a modified LIP program for the agency to reconsider without taking into account the constitutionally impermissible factor of whether Florida has opted into Medicaid expansion. To date, the agency has not responded to AHCA's letter or the public notice document. No statute or regulation requires it to reconsider Florida's LIP proposal or the agency's decision to link LIP funding to Medicaid expansion, and no administrative procedures exist for challenging that decision or the Agency's unconstitutional rationale in making it. Unless the agency reconsiders its decision to condition future LIP funding on Medicaid expansion, federal funding of and approval for the $2.2 billion LIP program will expire on June 30, 2015.

---

[4] AHCA also noted that, as a state agency, it cannot expand Medicaid. Among other things, AHCA's role merely is to ensure the continued operation of LIP. AHCA Letter 1.

## STANDARDS OF REVIEW

Through these two consolidated actions, the State has presented the Court with alternative paths to the same basic relief: immediate elimination of the unconstitutionally coercive condition that the federal government has attached to Florida's LIP program. Because CMS's April 14, 2015 letter publicly articulated the "definitive" position of the agency, with the evident expectation that Florida will "alter [its] primary conduct to conform to that position," it constitutes final agency action reviewable under the Administrative Procedure Act. *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986). Accordingly, the State has filed a complaint under the APA and now seeks preliminary injunctive relief in that APA action. In an abundance of caution, however, the State also has filed a petition for a writ of mandamus under the All Writs Act, through which this Court may review the federal government's actions and grant immediate relief should it decide that the APA's final agency action requirement is not satisfied. *See Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 543 F.2d 356, 358 (D.C. Cir. 1976).

Although the showing necessary to obtain relief through these two paths differs in degree, the relevant factors are substantially similar. A preliminary injunction is appropriate when a plaintiff establishes: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). Relief under the All Writs Act is appropriate when the petitioner establishes "(1) a virtual certainty of irreparable injury, (2) a similar certainty of success on the merits, for example,

outrageous or entirely unauthorized (*ultra vires*, so to speak) agency action, (3) minimal

harm to the agency, in the sense of disruption of its processes, and (4) the public interest clearly

favoring the assumption of jurisdiction." *V.N.A. of Greater Tift Cnty., Inc. v. Heckler*, 711 F.2d

1029, 1033-34 (11th Cir. 1983). Both sets of factors are amply satisfied here.

## ARGUMENT AND CITATION OF AUTHORITIES

Whether viewed through the lens of the APA or the All Writs Act, this is a

straightforward case. Indeed, it is a case that the Supreme Court has already resolved.

Three years ago, the Court held that the federal government may not withhold preexisting

Medicaid funding to coerce States into participating in the ACA's Medicaid expansion. Yet

that is precisely what the federal government is doing once again here. According to the

federal government, its decision whether to continue providing more than $1 billion in

Medicaid funding for Florida's LIP program is inextricably linked to Florida's decision

whether to participate in Medicaid expansion. That is so not because the two programs

serve the same function—they do not—or because participating in Medicaid expansion

would somehow enhance oversight of federal LIP funds—it would not. Instead, it is so

simply because the federal government has once again impermissibly tied continued receipt

of preexisting Medicaid funding (and the continued existence of much-needed services to

the most vulnerable) to Florida's expansion decision. Seven Justices found such tying

impermissibly coercive in *NFIB*, and the maneuver is no less coercive in its encore.

Because the Supreme Court has already held that the federal government may not

do what it is doing here, the State is virtually certain to prevail on the merits in the final

analysis. And the State is just as virtually certain to suffer irreparable harm if the federal

government's coercive tactics are not halted immediately. The $2.2 billion LIP program is critical to ensuring that hospitals are able to serve low-income patients ineligible for Medicaid, and that teaching and children's hospitals are able to continue performing their vital functions. Yet, as the federal government is well aware, continued operation of the LIP program without federal funding or approval is a non-starter. Decisions about how to wind down or eliminate funding need to be made now, and the damage to the State and those who will not receive needed care will be irreparable. Requiring the federal government to abide by the constraints of the Constitution will cause it no hardship, and undoubtedly is in the public interest. Accordingly, this Court should enter injunctive or mandamus relief now to eliminate the unconstitutionally coercive condition that the federal government has imposed on continued funding of Florida's LIP program.

## I.    CMS's Attempt To Condition Continued Funding Of Florida's LIP Program On Opting Into Medicaid Expansion Constitutes Unconstitutional Coercion.

"No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate." *New York v. United States*, 505 U.S. 144, 178 (1992); *see also Printz v. United States*, 521 U.S. 898, 925 (1997). As the Supreme Court reiterated just three terms ago, "[t]hat is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 132 S. Ct. at 2602 (plurality op.). Either way, the federal government must act in a manner that respects the "integrity, dignity, and residual sovereignty of the States." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). Indeed, "[r]especting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*,

132 S. Ct. at 2602. In short, "Congress may use its spending power to create incentives for States to act in accordance with federal policies[,] [b]ut when 'pressure turns into compulsion,' … the legislation runs contrary to our system of federalism." *Id.* (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

The Supreme Court has already applied these very principles to the precise question at hand. In *NFIB*, the Court considered whether Congress could threaten to withhold existing Medicaid funding in an effort to coerce a State into expanding its Medicaid program in the manner contemplated by the ACA. The Court answered with a resounding no. Indeed, seven Justices agreed that Congress' efforts to hold preexisting Medicaid funding hostage to ACA expansion blatantly violated the Constitution. As the plurality opinion explained, because "Medicaid expansion … accomplishes a shift in kind, not merely degree," from traditional Medicaid, it must at all times remain the prerogative of the States to decide for themselves whether to participate in that new program. *NFIB*, 132 S. Ct. at 2605 (plurality op.). To be sure, the federal government may attempt to entice States to do so by "offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use." *Id.* at 2607. But "[w]hat Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding." *Id.*; *see also South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (recognizing that "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs'" (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978)).

Yet that is precisely what the federal government has done once again here. According to CMS's April 14, 2015 letter, the federal government has conditioned more than $1 billion in preexisting federal Medicaid funding for Florida's LIP program on Florida's agreement to participate in Medicaid expansion. Just as in *NFIB*, then, the federal government is attempting to penalize Florida for exercising its constitutional prerogative not to participate in Medicaid expansion by withholding a separate and distinct stream of preexisting Medicaid funding. Here, as there, the federal government is well aware that the program it holds hostage is essential to the State's efforts to secure the provision of healthcare to many of its most vulnerable residents. Here, as there, the federal government is well aware that withholding the more than $1 billion in preexisting Medicaid funding renders continued operation of the LIP program untenable in Florida. And here, as there, there can be no mistaking the federal government's objective: to coerce Florida into participating in Medicaid expansion.

Indeed, the federal government's coercive intentions could not be plainer. Notwithstanding *NFIB*'s mandate that the federal government may not withhold preexisting Medicaid funding—period—to coerce States into expanding their Medicaid programs, Florida has gone out of its way to attempt to eliminate any potential overlap between the objectives furthered by the LIP program and those furthered by the ACA's expansion. Cognizant that at least some of the uncompensated care costs Florida currently faces would be compensable through the ACA were the State to expand, Florida volunteered to tailor the LIP program so that LIP funding would not be used to offset any of those costs. The State also explained repeatedly throughout negotiations with CMS how

the LIP program serves needs separate and apart from Medicaid expansion. First and foremost, the LIP program offsets more than $1 billion in costs attributable to care that would remain uncompensated even if Florida opted into Medicaid expansion—$125 million of which are attributable to Florida's children's hospitals alone. Moreover, the program provides hundreds of millions of dollars to medical schools, county health departments, and community clinics to help offset other costs that are not compensable under either existing Medicaid or the ACA.

Florida's willingness to tailor the LIP program to avoid overlap between those who do benefit from the LIP and those who would benefit from Medicaid expansion makes the coercive nature of the federal government's demands crystal clear. The federal government not only is conditioning pre-existing Medicaid funds on Florida's agreement to expand Medicaid (*i.e.*, precisely what *NFIB* forbids), but is using as a bargaining chip the vulnerable populations who currently depend on the LIP waiver to receive care and would not receive care under Medicaid expansion. Such individuals will lose the benefits of the LIP program if Florida will not accede to CMS's expansion demand. That is not just unconstitutional, but unconscionable.

The federal government insists that in its view, "coverage" (*i.e.*, Medicaid expansion) "rather than uncompensated care pools" (*i.e.*, LIP) "is the best way to secure affordable access to health care for low-income individuals." CMS Letter 2. The federal government is entitled to its opinion on that score, and it is entitled to try to persuade States to reach the same conclusion, including by offering new federal funding if States agree to opt into Medicaid expansion. But the federal government decidedly may *not* engage in

"economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *NFIB*, 132 S. Ct. at 2605 (plurality op.). Because the federal government's attempt to hold LIP funding hostage to Medicaid expansion "serves no purpose other than to force unwilling [Florida] to sign up for the dramatic expansion in health care coverage effected by the [ACA]," *id.* at 2603, its coercive actions in this case are no more constitutional than its coercive actions in *NFIB*.

Indeed, the manner in which the federal government has effected this coercion is even more constitutionally offensive than in *NFIB*. At least *NFIB* involved an unambiguous statutory command with a four-year phase-in period, leaving States time to consider and pursue various options, including seeking judicial relief. Here, the federal government waited until mere weeks before Florida's budget was due, and mere months before federal funding would expire, to spring its new unconstitutional condition. The federal government cannot plausibly have expected Florida to come up with a whopping $2.2 billion overnight to fund the LIP program on its own; nor to revamp in a matter of months a program statutorily and administratively structured to operate under a federal waiver that no longer exists. Instead, the federal government knew full well that its eleventh-hour condition would put the State in the untenable position of either eliminating entirely a program critical to the provision of healthcare to many of its most vulnerable residents, or capitulating to the demand to opt into Medicaid expansion. Those are precisely the kind of "gun to the head" tactics that the Constitution and *NFIB* prohibit. *NFIB*, 132 S. Ct. at 2604 (plurality op.); *see also id.* at 2607 (admonishing against

"'surprising participating States with post-acceptance or retroactive conditions'" on federal

funding (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)).

**II.     The State Will Be Irreparably Harmed Absent Immediate Relief.**

Without immediate relief from the coercion that the federal government has

inflicted, Florida, its healthcare providers, and its residents are virtually certain to suffer

irreparable harm.  Unless Florida accedes to CMS's unconstitutional demand to expand its

Medicaid program, federal funding for Florida's LIP program will expire on June 30, 2015.

And practically, the end of federal funding spells the end of the program.

Even assuming Florida could create $2.2 billion in healthcare funding out of thin

air, that alone would not solve the problem that CMS's unconstitutional actions have

created.  Because the LIP program is a waiver program, it can operate in its current form

only if CMS continues to waive the statutory Medicaid requirements that otherwise would

preclude the provision of quarterly, lump-sum payments to offset costs not eligible for

reimbursement under Medicaid—something that CMS apparently is not willing to do

unless Florida opts into Medicaid expansion.  In order to continue providing the same type

of funding to the myriad healthcare providers who currently receive LIP funding without

running afoul of restrictions on its existing Medicaid program, the State would essentially

need to create an entirely new program, funded by the State's general revenue, operating

entirely distinct from its existing Medicaid program, agency employees, and funding.  In

other words, unless the State capitulates to CMS's unconstitutional demand to expand its

Medicaid program, it faces the Hobson's choice of either coming up with $2.2 billion and

creating an entirely new regulatory machinery to distribute those new funds by June 30, 2015, or discontinuing its LIP program entirely.

There is no question that discontinuation of the LIP program would be "extraordinary and devastating in its consequences."[5]  Healthcare providers across the State rely on the program for quarterly, direct payments to compensate the critical and costly healthcare services they provide for little or no cost to uninsured, underinsured, and other low-income patients ineligible for Medicaid.  This year alone, Miami-based Jackson Memorial Hospital, a safety-net hospital and trauma center, expects to receive more than $500 million in LIP funding to offset the costs of providing uncompensated care to impoverished Floridians.  Senate Proposal 36.  By AHCA's estimates, the Shands at Jacksonville Medical Center, also a safety-net hospital, expects to receive $89 million in LIP funding; the Memorial Regional Hospital, $139 million; and the Broward Health System, $147 million.  *Id.* at 34, 37-38.  And the list goes on.  As the June 30 deadline nears, healthcare providers across the State will have to rethink the amount of uncompensated care they are able to provide to uninsured, underinsured, and other low-income patients without the supplemental payments upon which they have come to rely over the course of the last decade.

To make matters worse, CMS is holding hostage several millions of dollars in funding critical to healthcare providers that serve broader populations as well.  Children's hospitals in Florida stand to lose $125 million.  AHCA Letter 1.  St. Petersburg's All

---

[5] Hearing of the Senate Ethics and Elections Committee of the Florida Legislature, 1:03:32 (Apr. 15, 2015) ("statement of Sen. Donald Gaetz"), http://perma.cc/x3k4-wc9l.

Children's Hospital alone expected $27 million in total LIP funding for 2015 but could now get nothing—even though *not one* child who is not already covered by Medicaid would be eligible for coverage were Florida to opt into expansion. Senate Proposal 34. Likewise, medical schools stand to lose $200 million in LIP funding—funding those schools rely on to offset the cost of training the next generation of doctors. Navigant Report 192-93.

The harm CMS has inflicted here is thus even more devastating than the harm that the Fourth Circuit stepped in to prevent the Department of Education from inflicting on Virginia in *U.S. Department of Education v. Riley*, 23 F.3d 80, 84 (4th Cir. 1994) (providing relief under the All Writs Act). With $50 million of federal dollars at stake in *Riley*, the Fourth Circuit agreed with Virginia that the State would suffer "significant and indisputable" harm, including discontinuation of some primary education services and dismissal of some teachers, if the federal government continued to unlawfully withhold education funds "even if only for a temporary period." *Id.* With tens of millions at stake for more than 100 of Florida's healthcare providers, the harm is magnified exponentially here. Accordingly, whether through a preliminary injunction pursuant to the APA or a writ of mandamus pursuant to the All Writs Act, this is a paradigmatic case in which to grant immediate judicial relief.

Indeed, if CMS fails to reconsider Florida's LIP funding proposal using constitutionally permissible criteria by the June 30, 2015 deadline for the expiration of federal funding, any relief this Court orders likely would be "futile." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 605 (1966). The State simply does not have $2.2 billion to add to its monumental healthcare costs, which have grown by more than 23 percent since 2007 and

are generally the second-largest line item in the state budget. Navigant Report at 73-74. And even if it did, it is altogether improbable that the LIP program could continue in its current form. If the State and its healthcare providers cannot be assured of federal LIP funding by June 30, they will have no choice but to take preventative measures now and expend massive time and resources bracing for the imminent repercussions of more than a billion dollars in uncompensated care costs. Because there will be no realistic way to remedy after the fact the injury that the agency's unconstitutional actions is already inflicting, failure to do so now "could plausibly make later merits review impossible." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1288 (D.C. Cir. 2007).

The consequences of CMS's decision to use waiver programs as tools of coercion will not end with Florida. All 50 states have Medicaid waiver programs in place, and nine have LIP programs similar to Florida's. *See* Phil Galewitz, *Tennessee, Kansas Also Get Warnings: Expand Medicaid or Risk Hospital Funds*, Kaiser Health News (Apr. 21, 2015), http://perma.cc/a89t-mmla. CMS already has levied the same coercive threat at Texas, Tennessee, and Kansas, warning them to opt into Medicaid expansion now or face defunding of their waiver programs next year. Like Florida, these States thus find themselves in the impossible position of having the federal government treat the healthcare of many of their most vulnerable residents as leverage rather than a shared policy goal. Because that is not something that the Constitution tolerates, this Court should put an end to the government's coercive tactics immediately, before it is too late to repair the disastrous consequences that are sure to follow.

**III.    Immediate Relief To Alleviate Irreparable Harm To The State Will Cause The Agency No Unnecessary Harm Or Disruption.**

The State seeks nothing more from this Court than an order requiring CMS to revoke its unconstitutional ultimatum and reconsider Florida's proposal for the renewal of the LIP program under constitutional parameters. As a practical matter, that may well mean that CMS must continue funding the LIP program beyond June 30, 2015, as Florida has already addressed in good faith the various concerns that CMS has raised, and the agency's April 14, 2015 letter identifies no remaining barrier to continued funding that the State has not already acknowledged and expressed a willingness to address other than Medicaid expansion. But if CMS has other legitimate and constitutionally permissible reasons for denying Florida LIP funding, it will remain free to attempt to articulate those reasons (subject, of course, to judicial review). Either way, however, the relief Florida seeks will cause CMS no unnecessary harm or injury.

CMS has no legitimate interest in unconstitutionally conscripting a State to expand its Medicaid program, *see KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006), and any disruption the agency may face on account of the tight timing is of its own making. The agency is the one that decided to resort to unconstitutional tactics to try force Medicaid expansion on Florida—and waited until the last minute to do so. Worse still, CMS did so even though Florida informed the agency repeatedly and explicitly that it needed an agreement in principle no later than mid-April. Accordingly, CMS, not Florida, should bear the consequences of any hardship that may result from the remedying of the agency's unconstitutional actions. *See, e.g.*, *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) (any "self-inflicted harm" a non-moving party might incur "is

far outweighed by the immeasurable damage done" to moving party). At any rate, continuation of Florida's LIP program for another year will only put the federal government in the same position vis-à-vis Florida as it is in with respect to States such as Texas and Kansas.

## IV.    The Public Interest Weighs In Favor Of Immediate Relief.

The public interest weighs strongly in favor of immediate relief. Unconstitutional government actions rarely serve the public interest. *See, e.g.*, *KH Outdoor, LLC*, 458 F.3d at 1272. This case is certainly no exception. The State has made eminently clear that healthcare providers depend upon LIP funding to cover the costs of uncompensated care, fund the training of the next generation of physicians, support children's hospitals, and provide a multitude of other services not otherwise compensable under Medicaid, whether in its current or its expanded form. That is precisely why the federal government itself has recognized since 2005 that funding Florida's LIP program furthers the public interest. While the federal fisc is, of course, an important consideration as well, the federal government can hardly claim that continued funding of a program it has approved and funded for nearly a decade is now somehow contrary to the public interest. To the contrary, an abrupt discontinuation of the LIP funding will harm Florida's most vulnerable residents, for no reason other than because the State has exercised its constitutional prerogative to decide for itself whether to opt into Medicaid expansion.

## CONCLUSION

For these reasons, the State respectfully requests immediate relief either in the form of a preliminary injunction or a writ of mandamus under the All Writs Act.

Respectfully submitted,

s/Paul D. Clement

Allen Winsor (Fla. Bar 16295)
SOLICITOR GENERAL OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3688
Facsimile (850) 410-2672
allen.winsor@myfloridalegal.com

Paul D. Clement
 (D.C. Bar 433215)
Erin E. Murphy
 (D.C. Bar 995953)
Barbara Smith Grieco
 (D.C. Bar 1022506)
Taylor A.R. Meehan
 (IL Bar 6313481)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
Telephone: (202) 234-0090
Facsimile: (202) 234-2806
pclement@bancroftpllc.com

*Counsel for Plaintiffs-Petitioners*

May 7, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2015, I electronically filed this motion and sent a copy of the same *via* certified, first-class mail to:

Sylvia Burwell, Secretary
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

Andy Slavitt, Acting Administrator
U.S. Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

U.S. Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Loretta E. Lynch, Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Pamela Cothran Marsh, United States Attorney
U.S. Attorney's Office for the Northern District of Florida
111 North Adams Street
4th Floor U.S. Courthouse
Tallahassee, FL 32301

s/Taylor A.R. Meehan
TAYLOR A.R. MEEHAN
*Counsel for Plaintiffs-Petitioners*