# In the United States District Court for the Northern District of Florida

_____

| | |
|---|---|
| RICK SCOTT, in his official capacity as governor of Florida; STATE OF FLORIDA, by and through PAMELA JO BONDI, in her official capacity as attorney general of the state of Florida; AGENCY FOR HEALTH CARE ADMINISTRATION,<br>*Plaintiffs-Petitioners*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SYLVIA BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; ANDY SLAVITT, in his official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services,<br>*Defendants-Respondents*. | No. 3:15-cv-193-RS-CJK<br>(3:15-cv-195-MCR-EMT consolidated) |

_____

**AMICI CURIAE BRIEF FOR THE GOVERNORS OF TEXAS AND KANSAS IN SUPPORT OF PLAINTIFFS**

## INTEREST OF AMICI CURIAE

This lawsuit is more than an isolated dispute between Florida and a federal agency.  It began five years ago when Texas, Kansas, and twenty three other States joined Florida in challenging the Affordable Care Act's Medicaid expansion and mandate.  *NFIB v. Sebelius*, 132 S. Ct 2566 (2012).  In that case, the Supreme Court held that Congress could not abuse its spending power to coerce States into accepting Medicaid expansion.  Now the Department of Health and Human Services (HHS) is trying to accomplish what the Supreme Court told Congress it could not do:  use federal spending to coerce States like Florida, Texas, and Kansas into accepting a massive expansion of an already broken and bloated Medicaid program.

The amici curiae are the Governors of the States of Texas and Kansas.  The amici share Governor Scott's interest in governing their States as the voters see fit, without interference from federal officials pushing an agenda of conformity and control.  HHS has threatened to withhold from Florida billions of dollars in Medicaid payments, and it has issued similar threats to Texas, Kansas, and others.  These threats are surely just the beginning of a nationwide campaign to hold hostage federal waiver dollars in those States who are standing firm on their constitutional right to refuse the new Medicaid.

Seeking to preserve their right to self-governance in our federal system, and supporting Florida's effort to do the same, the amici Governors respectfully submit this brief in support of the Plaintiff State of Florida.

1

## ARGUMENT

I. **HHS'S STATED REASONS FOR TERMINATING FLORIDA'S MEDICAID FUNDS ARE PRETEXTUAL AND HAVE NO CLAIM TO THIS COURT'S CONFIDENCE.**

Hospitals nationwide provide over $50 billion per year in what is called "uncompensated health care" to patients with little or no health insurance and no ability to pay. Many States reimburse hospitals for much of this uncompensated care from a pool of federal Medicaid dollars. Florida receives $1.3 billion per year from Medicaid for this purpose. Compl. at 13 ¶ 41. Texas receives $3.5 billion. And California receives $1.7 billion. LUCIEN WULSIN AND KIWON YOO, ITUP, CALIFORNIA'S §1115 MEDICAID WAIVER (2011).

HHS is threatening to defund Florida's $1.3 billion program unless the State agrees to Medicaid expansion. Compl. at 3-4 ¶¶ 7, 8. Texas and Kansas have been threatened with the same punishment.

HHS's stated reason for cutting off funds to Florida is that Medicaid expansion somehow renders the uncompensated care program obsolete, *see id.*, but HHS's explanation is pretext that masks coercion. HHS's letter implies that if Florida would simply expand Medicaid, the State would not need funds for uncompensated care anymore. *Id.* The agency further suggests that the new Medicaid expansion was designed to replace the uncompensated care program, and that States who need such funding should embrace expansion. *Id.*

This explanation sounds innocent enough, but HHS's treatment of California exposes the explanation as a cover story. The State of California

2

has expanded Medicaid, yet it continues to incur billions of dollars in uncompensated care costs, and, unlike Florida, it will continue to receive billions of dollars from the federal government to cover those costs.

It is not surprising that States which expanded Medicaid, like California, still need funds for uncompensated care. Such funds cover much more than just individuals who otherwise would be covered by Medicaid expansion. For example, a large fraction of the funds reimburse hospitals required by federal law to treat undocumented immigrants who are not eligible for Medicaid, Medicaid expansion, or for subsidies on the ACA's insurance exchange.[1] *See* 8 U.S.C. § 1641 (restricting Medicaid to individuals who are "lawfully present" in the United States); 42 C.F.R. § 435.403 (same). Indeed, even the undocumented immigrants who are "lawfully present" under the Administration's deferred action program (DACA) are forbidden to receive Medicaid or ACA subsidies. *See* Letter, Dep't of Health and Human Servs., Individuals with Deferred Action for Childhood Arrivals (Aug. 28, 2012) (instructing States that even DACA beneficiaries who are lawfully present in the United States are not eligible for Medicaid or CHIP); NAT'L IMMIGRATION LAW CTR., DACA AND DAPA ACCESS TO FEDERAL HEALTH AND ECONOMIC SUPPORT PROGRAMS (Dec. 10, 2014) (the Obama Administration

---

[1] Hospitals that receive federal assistance, maintain charitable nonprofit tax status, or participate in Medicare cannot deny emergency treatment to individual who cannot afford the medical bills. 42 U.S.C.A. § 1395dd. Federal law allows private enforcement actions and civil penalties for hospitals that violate this provision. Roberts v. Galen of Virginia, Inc., 525 U.S. 249 (1999).

3

"issued regulations that deny access to health coverage under the ACA for DACA recipients and is expected to do the same for DAPA recipients").

In Texas alone, undocumented immigrants cost hospitals over $700 million per year in uncompensated care. *See, e.g.*, *Texas v. United States*, No. B–14–254, 2015 WL 648579, at *22 (S.D. Tex. Feb. 16, 2015) ("Evidence in the record also shows that in 2008, Texas incurred $716,800,000 in uncompensated medical care provided to illegal aliens."). In California, the State Hospital Association estimates that "Hospitals across California absorb roughly $1.25 billion a year in care for illegal immigrants." Tom Kisken, *Hospitals May Absorb $26 million Annually in Care for Undocumented*, VENTURA COUNTY STAR (July 3, 2011). The Nation's three most populous States are also the ones with the greatest number of undocumented immigrants: California, Texas, and Florida. If Florida and Texas expand Medicaid to childless adults, as California has done, the expansion will do nothing to address the cost of uncompensated care that the Administration's broken immigration policy imposes on all three States. STEVEN P. WALLACE ET AL., UCLA CENTER FOR HEALTH POLICY RESEARCH, UNDOCUMENTED AND UNINSURED: BARRIERS TO AFFORDABLE CARE FOR IMMIGRANT POPULATIONS (Aug. 2013) ("Undocumented immigrants will constitute a significant proportion of the remaining uninsured population and their concentration in a small number of states and localities places an uneven burden on the safety-net facilities in those areas.").

By funding California's program while refusing Florida's offer to tailor its own program to cover only costs not addressed by Medicaid expansion, *see* Compl. at 15-17 ¶¶ 50, 55, HHS is discriminating against Florida in favor of California, and it has offered no reasoned policy justification for doing so. Like California, Florida faces steep costs for uncompensated care that Medicaid expansion will do nothing to solve. HHS's decision to withhold funds from Florida while paying them to California can be motivated only by the agency's desire to coerce Florida into surrendering the constitutional rights it secured in *NFIB*, and to punish Florida for vindicating the same.

II.   **THE DISCRIMINATION AND COERCION UNDERLYING HHS'S DECISION RENDERS THE DECISION UNLAWFUL.**

HHS's decision to defund uncompensated care in States that have refused to expand Medicaid is unlawful for at least four reasons.

A.   First, the Supreme Court already has denied Congress the ability to use Medicaid funds to coerce States into accepting Medicaid expansion, and this Court should impose the same limits on a federal bureaucracy seeking to accomplish the same end. *See NFIB*, 132 S. Ct. at 2604-05. *NFIB*'s test for coercion is satisfied here. *NFIB* asks whether (1) the threatened funds are a large part of the State's budget and (2) the federal government is coercing the States to accept a new program by threatening existing program funds. *Id.* at 2601-07.

HHS is threatening to withhold $1.3 billion from Florida, or 3% of the State's budget. That is smaller than the 10% at stake in *NFIB*, but still a

5

coercively large budget shortfall, and far more than the amount the Court found insufficiently coercive in *South Dakota v. Dole*, 483 U.S. 203, 210 (1987) ("Congress has directed only that a State desiring to establish a minimum drinking age lower than 21 lose a relatively small percentage of certain federal highway funds."). Any argument that the second element is not satisfied is foreclosed by the Supreme Court's holding in *NFIB* that expanding Medicaid to childless adults is a new program that cannot be foisted upon the States by threatening preexisting funds.

      B.   HHS's approach also violates the Constitution's "fundamental principle of equal sovereignty" among the States. *N.W. Austin Mun. Util. Dist. Num. One v. Holder*, 557 U.S. 193, 203 (2009) (citing *United States v. Louisiana*, 363 U. S. 1, 16 (1960); *Lessee of Pollard v. Hagan*, 3 How. 212, 223 (1845); and *Texas v. White*, 7 Wall. 700, 725–726 (1869)). As the Court explained while striking down the Voting Rights Act's coverage formula in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), "the fundamental principle of equal sovereignty remains highly pertinent in assessing . . . disparate treatment of States." It is beyond dispute that Florida enjoys equal sovereignty with California, but only California is continuing to receive payments for uncompensated care to undocumented immigrants and other costs untouched by Medicaid expansion. HHS's decision to punish Florida until it submits to federal commandeering of its legislature is unlawful and should be enjoined.

6

C. HHS's action also violates the Administrative Procedure Act's prohibition on agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). HMS's discrimination against Florida in favor of California violates the "fundamental norm of administrative procedure [that] requires an agency to treat like cases alike," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007):

> If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases.

*Id.* CMS has done nothing to explain why one rule applies to States like California while another, stricter rule applies to States like Florida, Texas, and Kansas.

D. Finally, HHS's decision places an unconstitutional burden on Florida's decision to vindicate its constitutional rights in *NFIB*. Florida won a partial and very public victory against HHS in *NFIB*, and now the agency is threatening to punish Florida by punching a $1.3 billion hole in its budget unless Florida gives back everything it won from the agency two years ago.

The Constitution does not allow government officials to behave that way. In several different contexts, federal courts will void the actions of government officials whose use the power of their office to punish litigants for successfully vindicating their constitutional rights in court. In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Supreme Court held that the Due

7

Process Clause of the Fourteenth Amendment prevents federal and state judges from imposing harsher sentences on remand in retaliation for a defendant's successful appeal of the original sentence. *See id.* at 726 ("Due process of law . . . requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial."). In *Blackledge v. Perry*, 417 U.S. 21 (1974), the Court held that the Due Process Clause also prevents prosecutors from indicting a defendant as punishment for the defendants decision to appeal an earlier conviction. *See id.* 27 ("[T]he opportunities for vindictiveness in this situation are such as to impel the conclusion that due process of law requires a rule analogous to the *Pearce* case.").

If due process polices the motives of Article III judges, there is no reason it should not be just as watchful of federal bureaucrats. And although Mr. Pearce and Mr. Blackledge were being punished for exercising their right to access criminal courts, there is no reason to treat Florida's vindication of its constitutional rights in a civil proceeding any differently. *See St. Cyr*, 533 U.S. 300 (observing that "it would give rise to substantial constitutional questions" if a civil litigant were not allowed to vindicate constitutional rights in federal court); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 328-31 (1816) (Story, J.) (instructing that the Constitution protects a litigant's access at least to the Supreme Court for all matters, civil and criminal, arising under Article III of the Constitution.).

No litigant should be put to the choice of surrendering its day in court against an agency that is violating the constitution, or facing unjustifiable retaliation by the same agency in the future. HHS's public reasons for harassing Florida do not withstand scrutiny. The agency picked this fight with Florida in an unlawful attempt to isolate, intimidate, and coerce.

## CONCLUSION

The court should grant Florida's request for declaratory and injunctive relief.

Respectfully submitted.

| | |
|---|---|
| GREG ABBOTT<br>Governor of Texas | JAMES D. BLACKLOCK<br>General Counsel |
| | /s/ Arthur C. D'Andrea |
| J. REED CLAY, JR.<br>Senior Advisor to the Governor | ARTHUR C. D'ANDREA<br>Assistant General Counsel<br>Texas Bar No. 24050471 |
| | OFFICE OF THE GOVERNOR<br>1100 San Jacinto Blvd.<br>Austin, Texas  78711-2428<br>(512) 936-0181 (phone)<br>(512) 463-1932 (fax)<br>Arthur.Dandrea@gov.texas.gov<br>*Counsel for Amicus Curiae Governor of Texas* |
| SAM BROWNBACK<br>Governor of Kansas | BRANT LAUE<br>Chief Counsel, Office of the Governor |
| | OFFICE OF THE GOVERNOR<br>Kansas Capitol<br>300 S.W. 10th Ave., Suite 241S<br>Topeka, Kansas 66612-1590<br>785-296-3232<br>Brant.Laue@ks.gov<br>*Counsel for Amici Curiae Governor of Kansas* |

## CERTIFICATE OF SERVICE

I certify that on May 8, 2015, I served a copy of this brief on all counsel of record via this Court's CM/ECF system.

A copy of this brief also was served via certified mail on the United States Attorney General and the United States Attorney for the Northern District of Florida at the following addresses:

U.S. Attorney for the Northern District of Florida
Civil Process Clerk
Tallahassee Headquarters
111 North Adams Street
4th Floor U.S. Courthouse
Tallahassee, FL 32301

Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington DC 20530-0001

/s/ Arthur C. D'Andrea
ARTHUR C. D'ANDREA
*Counsel for Amici Curiae*