**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | | |
|---|---|---|
| RICK SCOTT, in his official capacity as Governor of Florida; *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 3:15-cv-193-MCR-CJK |
| | ) | 3:15-cv-195-MCR-CJK |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

SHEILA M. LIEBER
Deputy Branch Director

BRIAN G. KENNEDY
District of Columbia Bar No. 228726
MATTHEW J. BERNS
District of Columbia Bar No. 998094
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514-3357
Brian.Kennedy@usdoj.gov
Matthew.J.Berns@usdoj.gov

June 1, 2015                    *Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ......................................................................... 1

STATEMENT OF FACTS ................................................................ 6

    A.    The Medicaid Program .................................................. 6

    B.    Section 1115 Demonstration Projects ............................... 7

    C.    Florida's Section 1115 Demonstration and Low-Income Pool ................. 9

    D.    Transitional One-Year Extension of Low-Income Pool In 2014 ............. 11

    E.    Discussions In 2015 Regarding Possible Further Extension ................... 13

STANDARD OF REVIEW ............................................................... 20

ARGUMENT AND CITATION OF AUTHORITIES ................................... 20

I.        Plaintiffs Are Not Substantially Likely To Prevail ....................... 20

    A.    Plaintiffs' Claim Is Not Properly Before The Court ............... 21

        1.    The April 14 Letter Is Not Final Agency Action ...................... 21

        2.    Plaintiffs' Claim Is Not Ripe For Judicial Review ..................... 24

        3.    Mandamus Is Not Available ....................................... 26

    B.    Defendants Have Not Violated The Anti-Coercion Principle Of *NFIB* ... 27

II.       The Requested Relief Is Not Necessary To Prevent Irreparable Harm ......... 32

III.      The Public Interest And Balance Of Equities Weigh Against Plaintiffs ........ 34

CONCLUSION ............................................................................ 35

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967).................................................................................. 24

*Ark. Dep't of Health & Human Servs. v. Ahlborn*,
   547 U.S. 268 (2006).................................................................................... 6

*Armstrong v. Exceptional Child Center*,
   135 S. Ct. 1378 (2015).............................................................................. 18

*Ashwander v. TVA*,
   297 U.S. 288 (1936).................................................................................. 25

*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................. 21

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986).............................................................. 22, 23

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
   637 F.3d 408 (D.C. Cir. 2011).................................................................. 22

*Douglas v. Indep. Living Ctr. of S. Cal.*,
   132 S. Ct. 1204 (2012)................................................................................ 6

*Florida Pediatric Soc'y v. Dudek*,
   No. 05-23037-CIV (S.D. Fla. Dec. 30, 2014)............................................. 18

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
   641 F.3d 1259 (11th Cir. 2011) ................................................................ 26

*Imperial Carpet Mills, Inc. v. CPSC*,
   634 F.2d 871 (5th Cir. 1981) ................................................................... 25

*Johnson v. Sikes*,
   730 F.2d 644 (11th Cir. 1984) ............................................................. 24, 25

*LabMD, Inc. v. FTC*,
   776 F.3d 1275 (11th Cir. 2015) ...................................................... 21, 22, 25

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) .................................................................................... 28

*Mayhew v. Burwell*,
    772 F.3d 80 (1st Cir. 2014), *pet. for cert. pending* (No. 14-992) ................................ 31

*Meza v. U.S. Attorney Gen.*,
    693 F.3d 1350 (11th Cir. 2012) ................................................................. 24

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    132 S. Ct. 2566 (2012) ..................................................................... *passim*

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) .............................................................................. 24, 25

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003) ................................................................. 21

*NCAA v. Governor of New Jersey*,
    730 F.3d 208 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2866 (2014) ............................ 31

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................... 28

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ..................................................................................... 26

*Pharm. Research & Mfrs. of Am. v. Walsh*,
    ("PhRMA"), 538 U.S. 644 (2003) ................................................................. 6

*Pine v. City of W. Palm Beach*,
    762 F.3d 1262 (11th Cir. 2014) ................................................................. 20

*Serrano v. U.S. Attorney Gen.*,
    655 F.3d 1260 (11th Cir. 2011) ................................................................. 20, 26

*South Dakota v. Dole*,
    483 U.S. 203 (1987) .............................................................................. 30, 31

*Texas v. EPA*,
    726 F.3d 180 (D.C. Cir. 2013) ................................................................. 31

*Texas v. United States*,
    523 U.S. 296 (1998) .................................................................................... 25

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ................................................................... 25

*United States v. Rivera*,
  613 F.3d 1046 (11th Cir. 2010) ................................................. 24

*Weber v. United States*,
  209 F.3d 756 (D.C. Cir. 2000) ................................................... 33

**STATUTES**

5 U.S.C. § 704 ............................................................................... 21

42 U.S.C. § 1315 ............................................................................. 5

42 U.S.C. § 1315(a) ................................................................. 7, 26

42 U.S.C. § 1315(a)(2)(A) .............................................................. 8

42 U.S.C. § 1315(e)(2) ................................................................... 8

42 U.S.C. § 1315(f)(6) ................................................................... 8

42 U.S.C. § 1396 *et seq.* ............................................................... 6

42 U.S.C. § 1396a(a) ..................................................................... 6

42 U.S.C. § 1396a(a)(10) ............................................................... 6

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ............................................ 6

42 U.S.C. § 1396a(a)(10)(A)(ii) .................................................... 6

42 U.S.C. § 1396a(a)(10)(C) .......................................................... 6

42 U.S.C. § 1396a(a)(30)(A) ............................................... 13, 17, 18

42 U.S.C. § 1396b(a) ..................................................................... 6

42 U.S.C. § 1396c ........................................................................... 7

**REGULATIONS**

42 C.F.R. § 431.408(a) .................................................................................. 8

42 C.F.R. § 431.408(b) .................................................................................. 8

42 C.F.R. § 431.412(a)(1) .............................................................................. 8

42 C.F.R. § 431.412(a)(2) .............................................................................. 8

42 C.F.R. § 431.412(a)(3) .............................................................................. 9

42 C.F.R. § 431.412(b)(1)(i) .......................................................................... 8

42 C.F.R. § 431.412(b)(1)(ii) ......................................................................... 8

42 C.F.R. § 431.412(c)(2)(vii) ....................................................................... 8

42 C.F.R. § 431.412(c)(3) .............................................................................. 8

42 C.F.R. § 431.412(c)(4) ............................................................................ 33

42 C.F.R. § 431.416 ....................................................................................... 8

42 C.F.R. § 431.416(e) ................................................................................... 8

42 C.F.R. §§ 431.400-.428 ............................................................................. 8

*Review and Approval Process for Section 1115 Demonstrations*,
   77 Fed. Reg. 11,678 (Feb. 27, 2012) ....................................................... 8, 9

**MISCELLANEOUS**

Matthew Buettgens, *Clarification of Urban Institute Estimates of
   Uncompensated Care in Florida* (Apr. 21, 2015)
   http://www.urban.org/sites/default/files/alfresco/publication-pdfs/2000198-
   Clarification-of-Urban-Institute-Estimates-Of-Uncompensated-Care-in-Florida.pdf .. 19

CMS, State Medicaid Director Letter, Revised Review and Approval Process for
   Section 1115 Demonstrations (Apr. 27, 2012) ........................................... 19

http://www.gallup.com/poll/181664/arkansas-kentucky-improvement-uninsured-
   rates.aspx?utm_source=alert&utm_medium=email&utm_content=heading&utm_camp
   aign=syndication ....................................................................................... 19

https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8384.pdf ........................... 19

Nat'l Ass'n of State Budget Officers, State Expenditure Report (2014),
    http://www.nasbo.org/sites/default/files/State%20Expenditure%20Report
    %20%28Fiscal%202012-2014%29S.pdf .................................................................. 30

**INTRODUCTION**

Plaintiffs claim that Defendants have abruptly decided to "withhold[] massive amounts" of federal Medicaid funding by allowing a "waiver program" called the Low-Income Pool ("LIP") to expire at the end of June "unless Florida agrees to participate in the [Affordable Care Act ('ACA')] Medicaid expansion." Pls.' Mem. at 1. That is not so. *Before and after* Plaintiffs moved for a preliminary injunction, Defendants have been working closely with Plaintiffs to design a reformed LIP and have made it clear – including in discussions directly between the Governor and the Secretary of Health and Human Services ("HHS") – that a LIP can be approved *whether or not* Florida agrees to expand its Medicaid program. Defendants have not made any final decision – primarily because Florida submitted its LIP amendment request only last week – but the reforms being considered would not involve the loss of "massive amounts" of federal funding and may not involve any loss at all. Put simply, Plaintiffs would have the Court review a decision that has not yet been made. And they would have the Court order the Secretary to refrain from doing what she has repeatedly said she would not do. Plaintiffs' request that the Court interfere prematurely in these ongoing discussions should be rejected.

As a threshold matter, the Secretary has yet to take any final agency action affecting the future of the LIP. Florida did not even submit its formal request to extend the LIP until May 26, 2015, even though Florida was obligated to submit any such request at least 120 days before the LIP expired. Yet Plaintiffs filed their preliminary injunction motion while Florida's eventual request was still undergoing the period of public comment that is a prerequisite to its submission, erroneously faulting the Secretary

for delay in approving Florida's not-yet-submitted amendment request. Florida's request is now undergoing another required public comment period, and Defendants have not made any final decision regarding Florida's future LIP funding.

*Second*, and perhaps most fundamentally, Defendants have *not* conditioned extension of the LIP on Florida's agreement to expand its Medicaid program. The letter of April 14, 2015, on which Plaintiffs base their motion, sets forth three principles that Defendants intend to apply to all States with similar demonstration projects, regardless of whether they have expanded their Medicaid program. These principles – that supplemental pool funds should not pay for costs that could be covered in a Medicaid expansion, that Medicaid payments should support services to Medicaid beneficiaries and other low-income uninsured individuals, and that Medicaid rates must be sufficient to promote provider participation and access – are central to the sound administration of the Medicaid program. Importantly, not one of those principles requires Medicaid expansion. Moreover, Plaintiffs fail to note that since that letter, Defendants have repeatedly told Florida that they will consider some extension of the LIP whether or not Florida decides to expand its Medicaid program. Secretary Burwell personally stated this to Governor Scott in a meeting on May 6. *See* Wachino Decl. ¶ 12. Yet on the very next day – without even alluding to that meeting – Governor Scott sought a preliminary injunction asking that the Secretary be ordered to refrain from doing what she had just reaffirmed she would not do. Defendants yet again confirmed that Florida's future LIP funding is not conditioned on Medicaid expansion on May 21, when they informed Florida by letter of

their preliminary conclusion that LIP funding for Florida should be approximately $1 billion for the coming fiscal year – whether or not Florida expands Medicaid. *See* Ex. 7.

*Third*, what is at stake is not the "withholding" of federal Medicaid funding but a change in how federal funding is used within Florida to pay Medicaid providers. Indeed, Florida's own analysis indicates that its "total Medicaid funding levels" could be "virtually unchanged" even if LIP funding were reduced in accordance with Defendants' preliminary feedback to the State. Ex. 8, at 1. The current demonstration project allows Florida to pay Medicaid providers in part through distributions from a pool of supplemental funds (the LIP) instead of through Medicaid's ordinary mechanism of fee-for-service payments or managed care payments. Without the LIP, Florida would continue to receive federal matching funds for its Medicaid fee-for-service and managed care payments, and could increase its federal funding by increasing such payments. Thus, although the $1 billion LIP that Defendants have preliminarily suggested for 2015-2016 is smaller than this year's pool, Florida could more than make up for the difference by increasing its managed care payments. *See* Ex. 7, at 4.

*Fourth*, Defendants' request that Florida change how it pays Medicaid providers was neither abrupt nor did it create an emergency as Plaintiffs now claim. Defendant Centers for Medicare & Medicaid Services ("CMS") expressed concern about the transparency and equity of Florida's existing LIP payment mechanism over a year ago, when considering whether to extend the LIP beyond its expiration date of June 30, 2014. In April 2014, CMS and Florida agreed to extend the LIP "for a limited time during Florida's transition to . . . a significantly reformed Medicaid payment system." Ex. 1 at 1.

Florida also agreed to review Medicaid provider payment and funding mechanisms "to move toward" a goal of raising Medicaid fee-for-service and managed care payments to levels high enough to "ensure access for Medicaid beneficiaries to providers without payments through the LIP." *Id.* at 2. Although Florida agreed to transition toward such reforms, the several informal outlines of proposals that the State asked Defendants to consider before filing this lawsuit reflected little progress in that direction. *See* Fishman Decl. ¶¶ 14, 17-20. Indeed, the State proposed to keep the LIP at the same size as it was last year and double what it was in 2013. Defendants' preliminary analysis of these proposals indicated that they were inconsistent with HHS's expectation that Florida would transition away from the LIP funding mechanism and Florida's agreement that it would do so. Also, although Florida agreed that LIP funding would not be used to pay for costs attributable to those Floridians who would become eligible if Florida expanded its Medicaid program (whether or not it actually does), Florida's proposals appeared not to reflect that agreement and not to account for the significant increase in coverage resulting from previously uninsured individuals obtaining insurance through Florida's Health Exchange.

Notwithstanding the deficiencies in Florida's initial proposals and its delays in submitting its formal request, the Secretary has gone to great lengths to work with Plaintiffs to craft an acceptable LIP amendment and to accommodate Florida's desire for expedited consideration. The parties' discussions about the LIP are (as they had been) progressing without regard to whether Florida expands its Medicaid program. Thus, the premise of Plaintiffs' complaints of unconstitutional coercion is baseless.

*Finally*, Plaintiffs have shown no violation of the anti-coercion principle of *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2566 (2012) (*NFIB*). It is not just that Defendants are not in fact conditioning extension of the LIP on Florida's decision to expand Medicaid – though that itself is sufficient reason to reject Plaintiffs' claim. Even if Florida's factual allegations were correct, the stakes here are not what they were in *NFIB*, where *all* of the State's Medicaid funding was at issue. The LIP represents only one-ninth of that funding, and all of that amount can be preserved without Medicaid expansion but with the other payment-mechanism reforms that Defendants have suggested. And the reliance interest that featured so heavily in *NFIB* is absent here: the LIP is a time-limited, wholly discretionary demonstration project. It was approved under Section 1115 of the Social Security Act, which provides that the Secretary "*may waive*" Medicaid program requirements and authorize federal funding "to the extent and *for the period* prescribed by the Secretary" to allow a State to establish an "*experimental, pilot, or demonstration project*," if "*in the judgment of the Secretary*, [it] is likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315 (emphases supplied). Florida agreed in 2014, before any alleged coercion, that it would transition away from the LIP and has no basis for assuming that it would continue perpetually and without change.

Judicial involvement in the administrative review process and ongoing discussions between the Secretary and Florida would be both inappropriate and unnecessary. Plaintiffs have failed to show a likelihood of success on the merits or to satisfy any of the other prerequisites for emergency relief, and the motion for a preliminary injunction should thus be denied.

## STATEMENT OF FACTS

### A.    The Medicaid Program

The Medicaid program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, "provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs." *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). A participating State must submit to the Secretary of HHS a plan that details the nature and scope of its Medicaid program and complies with federal statutory and regulatory requirements. *See* 42 U.S.C. § 1396a(a); *Douglas v. Indep. Living Ctr. of S. Cal.*, 132 S. Ct. 1204, 1208 (2012). States with approved state plans receive federal reimbursement for a percentage of their expenditures under the plan. 42 U.S.C. § 1396b(a).

Since the Medicaid program's inception, federal law has required participating States to treat specific categories of individuals as eligible for certain health care benefits under their state Medicaid plans. *See* 42 U.S.C.§ 1396a(a)(10); *Pharm. Research & Mfrs. of Am. v. Walsh* ("*PhRMA*"), 538 U.S. 644, 650-51 & n.4 (2003). States also have the option of covering certain other categories of individuals. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii), (a)(10)(C); *PhRMA*, 538 U.S. at 650-51 & n.5.

In the Patient Protection and Affordable Care Act ("ACA"), Congress required States to expand the population covered by their state Medicaid plans to include all individuals under 65 with incomes at or below 133 percent of the federal poverty line, provided they are not receiving Medicare. 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). If a State failed to amend its state plan to cover the expansion population, it could have lost

all future federal funding for its existing Medicaid program. *See id.* § 1396c. In *NFIB*, the Court held that Congress had exceeded its power under the Spending Clause by conditioning States' continued participation in the Medicaid program on their agreement to cover the expansion population, the latter of which the Court regarded as a new spending program, rather than a mere amendment of the existing Medicaid program. *See* 132 S. Ct. at 2601-07. The Court "fully remedie[d] the constitutional violation" by establishing that the Secretary may not use her § 1396c authority to terminate a State's participation in the Medicaid program (along with *all* of its federal Medicaid funding) on the ground that the State has declined to cover the expansion population. *Id.* at 2607.

### B.      Section 1115 Demonstration Projects

Section 1115 of the Social Security Act provides that the Secretary, at a State's request, "*may* waive" specific Medicaid program requirements and authorize federal financial participation in demonstration expenditures "to the extent and for the period prescribed by the Secretary," to enable the State to carry out an "experimental, pilot, or demonstration project which*, in the judgment of the Secretary*, is likely to assist in promoting the objectives" of Title XIX. 42 U.S.C. § 1315(a) (emphasis supplied). Although the statute establishes these broad conditions that must be met before the Secretary *may* approve a demonstration project, the statute identifies no set of conditions or circumstances under which the Secretary *must* approve such a project.

Section 1115 allows the Secretary to direct federal funding to projects that introduce new programmatic approaches that could serve as models for future policy-making. The Secretary has approved demonstrations that expand eligibility to people who

would not otherwise qualify, that tailor the benefits offered to specific populations, and that explore new and potentially improved methods of financing healthcare for those currently eligible for Medicaid and other low-income individuals. *See Review and Approval Process for Section 1115 Demonstrations*, 77 Fed. Reg. 11,678, 11,678 (Feb. 27, 2012). Although the costs of these experimental programs ordinarily would not be considered Medicaid expenditures eligible for federal matching funds, Section 1115 allows the Secretary to "regard" them as such. 42 U.S.C. § 1315(a)(2)(A). The Secretary generally limits Section 1115 demonstration projects to an initial term of five years and may extend them, generally in increments of up to three years. *See id.* § 1315(e)(2), (f)(6).

HHS regulations establish procedures and timeframes for creating, renewing, and evaluating demonstration projects. *See* 42 C.F.R. §§ 431.400-.428. Prior to submitting an application for a new or renewed demonstration project, a State must provide a public notice-and-comment period of at least 30 days, hold public hearings, and consult with Indian tribes, health programs, and health organizations. *Id.* §§ 431.408(a), (b); 431.412(a)(1), (c)(2)(vii). Once CMS receives a complete application, it opens another 30-day notice-and-comment period, *id.* § 431.416, and CMS may request that the State make changes to the application or submit more information, *id.* § 431.412(a)(2), (b)(1)(i), (c)(3). The State also may propose modifications to its application or volunteer additional information. *See id.* § 431.412(a)(2), (b)(1)(ii), (c)(3). CMS ordinarily will not render a final decision on an application until at least 45 days after the application is complete. *Id.* § 431.416(e).

Although amendments to existing demonstrations are not subject to these regulations, 77 Fed. Reg. at 11,690, CMS offers the public an opportunity to comment on proposed amendments. *See* CMS, State Medicaid Director Letter, Revised Review and Approval Process for Section 1115 Demonstrations at 5 (Apr. 27, 2012). In addition, the terms and conditions of particular demonstration projects may include procedural requirements for submitting amendments. As relevant here, the terms and conditions of the Florida's demonstration require that amendment requests "must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation," and undergo a period of state-level notice and comment before submission. Ex. 2 at 5-6 of 58.[1]

### C.    Florida's Section 1115 Demonstration and Low-Income Pool

In 2005, CMS approved Florida's request for a Section 1115 research and demonstration waiver – called "Medicaid Reform" – that was primarily intended to transition Florida gradually from a fee-for-service payment model to a managed care payment model. *See* Pls.' Ex. 3 at 63.[2]

---

[1] Even before an application or amendment request is formally submitted, CMS and a State may engage in discussions about what kinds of proposals CMS is likely to approve. *See* 42 C.F.R. § 431.412(a)(3). CMS and Florida engaged in such an exchange about the LIP, and their discussions have continued since Florida submitted its amendment request.

[2] Fee-for-service is the traditional Medicaid model in which Medicaid pays providers directly for services rendered. Under the managed care model, the Medicaid program makes per beneficiary "capitation" payments to managed care organizations that are then responsible for arranging for the beneficiaries enrolled in their plans to receive care from providers at pre-established rates. *See id.* at 50-56.

CMS initially approved the demonstration for the five-year period beginning on July 1, 2006. *See id.* at 63; Ex. 2 at 2 of 58. On December 15, 2011, after temporarily extending the demonstration beyond its original expiration date of June 30, 2011, CMS extended the demonstration for three years, through June 30, 2014. Ex. 2 at 2 of 58

CMS authorized the LIP at issue in this case as part of the original Medicaid Reform demonstration. Pls.' Ex. 3 at 63. Quarterly lump-sum payments from the pool are made to some hospitals, clinics, and other providers to supplement the revenue they receive from other sources including Medicaid claims payments (fee-for-service and managed care payments), Medicaid disproportionate share hospital (DSH) payments, Medicare, and private insurance. These supplemental payments were intended to help narrow the gap between Medicaid payments and providers' costs of treating Medicaid beneficiaries and also help defray providers' costs of treating the uninsured and underinsured. *Id.* at 62. But these supplemental payments "were never intended to cover all uncompensated care costs." *Id.* at 106.

The Florida LIP was capped at $1 billion per year through June 2014, of which the federal government contributed approximately 60 percent. Pls.' Mem. at 6; Pls.' Ex. 3 at 13. Florida finances the "state share" of the LIP almost entirely through local contributions from public hospitals, counties, hospital taxing districts, and other government entities, instead of through state general revenue funds. Pls.' Ex. 3 at 13-14, 174-75. Florida allows the local entities making these contributions to earmark them for specific providers and – because their contributions draw federal matching funds – is generally able to guarantee that the LIP will pay sponsored providers more than the

amount contributed in their name and still have funds left over to distribute to some providers without local backers. *See id.* at 15-17, 76-78. As a result of these contribution arrangements, the net benefit to providers of payments from the LIP is substantially less than the gross amount of such payments.

There are "inherent inequities" in Florida's reliance on local contributions to fund the state share of the LIP, *id.* at 115, because hospitals with access to local contributions "receive significantly higher levels of reimbursement" for their costs of treating Medicaid, uninsured, and underinsured patients than providers without them, *id.* at 101. And willing local sponsors are not evenly distributed throughout the State. In fact, in 2012-2013, three local entities – Miami-Dade County and the North and South Broward Hospital Districts – together contributed over 80 percent of the state share of LIP funding. *Id.* at 78. Plaintiffs' brief focuses on hospitals sponsored by those entities (Jackson Memorial Hospital (Miami-Dade); Memorial Regional Hospital (South Broward); and Broward Health System (North Broward)) rather than on hospitals that receive smaller LIP payments or none at all, and does not discuss the amounts of uncompensated care these hospitals provide relative to others. *See* Pls.' Mem. at 5, 21; Pls.' Ex. 6 at 54, 57, 58.

### D.    Transitional One-Year Extension of Low-Income Pool In 2014

In 2014, CMS not only extended the LIP but agreed to increase the original $1 billion cap to $2,167,718,341 largely to take into account the State's additional shift of Medicaid beneficiaries into managed care plans on a statewide basis. *See* Ex. 2; *see also* Ex. 1 at 1. That increase was authorized on July 31, 2014, after a one-month temporary

extension of the prior demonstration, which was then renamed the Managed Medical Assistance Program. The 2014 approval made clear that the increased LIP payments were in recognition of Florida's need for a transition period to reform its payment structure to account for supplemental payments that Florida had previously made under its state plan's fee-for-service model but that were not available under managed care. Ex. 2 at 1-2.

However, CMS also expressed significant concerns to Florida about the LIP's transparency and equity, including the fact that providers' LIP payments did not necessarily correspond to the providers' relative volumes of Medicaid and uninsured care. CMS accordingly encouraged Florida to explore other funding and payment options. In April 2014, CMS and Florida reached an agreement in principle that Florida would "review [its] Medicaid provider payments and funding mechanisms, with the goal of developing" such "funding mechanisms that will ensure quality health care services to Florida's Medicaid beneficiaries throughout the state *without the need for LIP funding*." Ex. 1 at 1 (emphasis supplied). CMS and Florida further agreed that Florida would secure an independent report that would recommend "reforms to the Florida Medicaid financing system that can allow the state, beginning in state fiscal year 2015, to move toward Medicaid fee-for-service and managed care payments that ensure access for Medicaid beneficiaries to providers without payments through the LIP." *Id*. at 2. In the meantime, CMS agreed to extend the LIP, but only for a one-year period "to provide stability for providers for a *limited* time during Florida's *transition to* statewide Medicaid managed care and *a significantly reformed Medicaid payment system*." *Id.* at 1 (emphases supplied). The terms and conditions of the final approval of the one-year extension

likewise reflected CMS's expectation that Florida would prepare to transition away from reliance on the LIP, Ex. 2 at 33-34 of 58, and Florida agreed to those terms, Ex. 3.

An approach like the one CMS advocated in 2014 and that Florida agreed to consider has several advantages, as confirmed by the Navigant report commissioned by Florida: It is "rationally based, and would be consistent with the [42 U.S.C. § 1396a(a)(30)(A)] standards related to efficiency and economy, and adequate access to quality care"; it would "more closely align[] payments with Medicaid patient utilization than does the current LIP funding distribution mechanism"; and it could help enable "stronger quality-based financial incentives" that "could help reduce unnecessary utilization and lower overall cost to the Medicaid program." Pls.' Ex. 3 at 182-83.

### E. Discussions In 2015 Regarding Possible Further Extension

On May 26, 2015 (*i.e.*, nearly three weeks after filing the preliminary injunction motion), Florida submitted its formal request to extend the LIP beyond June 30, 2015.[3] The Secretary has yet to approve or disapprove that request – having just received it – although CMS provided Florida with extensive, albeit preliminary, feedback on the version of Florida's proposal that the State made available for public comment prior to its submission to CMS. *See, e.g.*, Ex. 7.

---

[3] Citing paragraph 8 of the Senior Declaration, Plaintiffs' brief states (at 9): "As it had in past years, CMS indicated that the State need not submit a formal application for LIP funding." The declaration, however, does not state that a formal request for LIP funding was not made in previous years or that CMS indicated that one was unnecessary in 2015. In fact, Florida had submitted a formal extension application prior to the April 2014 agreement in principle. *See* Fishman Decl. ¶ 16.

Over the course of the first several months of 2015, CMS engaged with Florida in numerous discussions over the future of the LIP, including possible extensions and reforms. *See* Senior Decl. ¶¶ 9-16; Fishman Decl. ¶¶ 12-21. In many instances, the ideas Florida floated in these discussions were broad outlines of potential LIP approaches, such as simple spreadsheets with basic tables and without any explanatory narrative. *Id.* ¶¶ 17-19. The more substantive exploratory submissions would sometimes be superseded by the State's next submission. *See id.* "At no point in the numerous meetings or calls [during this period] did CMS explicitly inform [Florida's Medicaid Director] that its decision whether to continue to fund the LIP program would be based on whether Florida opted into Medicaid expansion." Senior Decl. ¶ 16.[4]

On April 14, 2015, Acting Medicaid Director Wachino sent a letter to Florida. *See* Pls.' Ex. 1. Plaintiffs claim that this letter demonstrates Defendants' intent to condition extension of the LIP on Florida's expansion of its Medicaid program. To the contrary, this letter sets forth general policies CMS would seek to apply in States that currently use

---

[4] Plaintiffs seek to portray one period of these discussions as CMS "going dark" as a prelude to "abruptly changing course." *See* Pls.' Mem. at 11. Plaintiffs claim that, despite allegedly knowing that Florida was facing a "looming deadline, CMS notified Florida in the first week of April that it would not be available for any additional meetings for weeks." *Id.* at 10 (citing Senior Decl. ¶ 14). In fact, *one* CMS official involved in the discussions, Eliot Fishman, was taking a long-scheduled two-week vacation abroad. Fishman Decl. ¶ 21. Mr. Fishman told his counterpart in Florida of this vacation beforehand, and Florida was informed that in Mr. Fishman's absence it could contact a senior policy advisor who was intimately familiar with the LIP discussions. *Id.* In addition, Mr. Fishman's supervisor, the Acting Director of the Center for Medicaid and CHIP Services, Vikki Wachino, herself reached out to Florida's Medicaid Director in Fishman's absence. Senior Decl. ¶ 15; Wachino Decl. ¶¶ 5-7. Moreover, during this two-week period of allegedly "going dark," the agency was, among other things, considering how to evaluate the continued use of supplemental payment pools by all the States that use variations of that funding mechanism. *See* Wachino Decl. ¶¶ 8-9.

LIP funding. In addition, the letter noted there was ongoing interest in Florida's legislature in Medicaid expansion. *Id.* at 1. The letter continued by affirming CMS's view – which was no change, abrupt or otherwise, in position – that the Medicaid expansion being considered by the legislature would be "a more comprehensive approach to providing health care coverage." *Id.* The letter further states that "the future of the LIP, sufficient provider rates, and Medicaid expansion are linked," *id.* at 1, and fleshes out the nature of the linkage by describing the "key principles" CMS intends to apply as it "approach[es] review of a LIP proposal from Florida," *id.* at 2.[5] The letter does not say that continued funding of a LIP would be contingent on Florida's agreement to Medicaid expansion.

As for the link between the LIP and provider payment rates, increased rates would mean a reduction in the uncompensated care costs that the LIP is ostensibly designed to address. CMS explained that "provider payment rates must be sufficient to promote provider participation and access, and should support plans in managing and coordinating care." Pls.' Ex. 1 at 2. Yet, LIP payments, instead of *supplementing* provider payment rates (for some providers), were increasingly *supplanting* adequate payment rates for all providers. As the Navigant Report commissioned by Florida would confirm, during the period the LIP has been in place, Florida has cut payment Medicaid rates "nearly every year," with the "cuts . . . collectively amount[ing] to over 25 percent in reductions to hospital rates." Pls.' Ex. 3 at 69. CMS had sound reasons for recommending that Florida

---

[5] The Navigant report commissioned by Florida to study transition from the LIP considers throughout both expansion and the LIP, as well as the way in which the two are related. *E.g.*, Pls.' Ex. 3 at 116-31 (chapter devoted to Medicaid expansion).

shift funding away from its increased reliance on the relatively ad hoc and geographically disparate supplemental LIP payments in order to bolster the provider payment rates that had been cut.

With respect to the LIP and Medicaid expansion, the April 14 letter explained that LIP funding "should not pay for costs that would be covered in a Medicaid expansion," Pls.' Ex. 1 at 2, a conclusion that Florida does not contest in this litigation, Pls.' Mem. at 1, 9, 11; Senior Decl. ¶¶ 7, 16. That policy reflects in part CMS's view that "coverage rather than uncompensated care pools is the best way to secure affordable access to health care for low-income individuals." Pls.' Ex. 1 at 2.[6]

Florida responded on April 15, 2015, expressing concern that the April 14 letter "appear[ed]" to impermissibly condition continuation of the LIP on Medicaid expansion. Pls.' Ex. 2 at 1. Florida nevertheless sought to move ahead with the LIP discussions, promising to "promptly file a formal amendment . . . that will renew the LIP for two years," *id.*, and expressing "hope" that "the federal government receives our LIP amendment cordially," *id.* at 2.

The April 14 letter does not make any continued LIP funding contingent on Florida deciding to expand its Medicaid program. Indeed, CMS intends to apply the general principles set forth in the letter to assess supplemental pool proposals both from States that *have* decided to expand their Medicaid program and from States that have not. *See* Ex. 7 at 2. Thus, in the days after CMS sent its letter to Florida, it informed several

---

[6] The letter also pointed out that "transition periods can ease the process of reducing the LIP as the state makes the transition to broader Medicaid coverage for its residents at sustainable rates." *Id.*

expansion States (including California and Arizona) that CMS planned to apply the same principles to their supplemental pools. Fishman Decl. ¶ 24 & Ex. 6.[7]

Statements of Defendants after April 14 confirm that Defendants will consider Florida's LIP extension request *whether or not* Florida opts into Medicaid expansion. *E.g.*, Ex. 7. Indeed, on May 6, Secretary Burwell met with Governor Scott in person and reiterated that whether a State receives federal funding for an uncompensated care pool does not depend on whether that State expands its Medicaid program. Wachino Decl. ¶ 12.

CMS's letter to Florida of May 21, 2015 further confirms Defendants' continued openness to consider approval of a LIP program in Florida with reasonable reforms, regardless of Medicaid expansion. *See* Ex. 7. After noting that CMS would make a final determination on the LIP after Florida submits its formal request and CMS reviews the public comments, CMS (in consideration of the Florida's legislative schedule) provided "preliminary feedback" on the version of a proposal that Florida had posted for public comment. *Id.* at 1. CMS's preliminary conclusion was that "2015-16 [LIP] funding should be at approximately $1 billion, consistent with the funding level for the LIP prior to 2014, to maintain stability while the system transitions. Funding in subsequent years at a more sustainable and appropriate level to cover the state's remaining uncompensated

---

[7] In both expansion and non-expansion States, "uncompensated care pool funding should not pay for costs that would be covered in a Medicaid expansion," Pls.' Ex. 1 at 2, "Medicaid payments should support services provided to Medicaid beneficiaries and low-income uninsured individuals," *id.*, and provider payment rates must be "consistent with efficiency, economy, and quality of care" and "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area," 42 U.S.C. § 1396a(a)(30)(A); *see* Pls.' Ex. 1 at 2.

care costs would be approximately $600 million." *Id*. CMS went on to "note that this level of funding for the LIP, coupled with the options the state may elect at its discretion described in this letter, *would enable Florida to retain Medicaid investment in the state at or above the current $2.16 billion level of LIP funding*." *Id*. (emphasis supplied).

These options include ones other than Medicaid expansion, *id*., and involve increasing provider rates, *id.* at 3-4. CMS noted that the concerns it had expressed in 2014 about the sufficiency of provider rates had since been "buttressed" by the Navigant Report's finding that provider payment rates had been cut 25% since the LIP had been created. *Id*. at 3. And CMS expressed a related concern (*id*.) about the recent findings of a district court that Florida's payment rates for physicians are too low to promote the quality of care and equal access to care required by 42 U.S.C. § 1396a(a)(30)(A). *See* Findings of Fact and Conclusions of Law at 144 (ECF # 1294), *Florida Pediatric Soc'y v. Dudek*, No. 05-23037-CIV (S.D. Fla. Dec. 30, 2014).[8]

The May 21 letter also noted that, while Florida was proposing a "modest" and "incremental" change in how LIP funds were distributed, it did not propose shifting any "net LIP dollars" into rates, Ex. 7 at 3, despite Florida's 2014 agreement to look to reforms shifting Medicaid funding from the supplemental pool into higher rates. In addition, Florida's proposal appeared not to take into account two reasons why the uncompensated care costs that the LIP addresses should be lower than in past years: (1)

---

[8] As noted by both the CMS letter and the district court in *Florida Pediatric*, the decision in *Armstrong v. Exceptional Child Center*, 135 S. Ct. 1378 (2015), makes it clear that enforcement of this substantive mandate that Medicaid rates be adequate is assigned to the Secretary in the first instance rather than to district courts entertaining private suits against the States.

CMS and Florida agree that the LIP should no longer cover costs that could be covered by Medicaid expansion, *see* Pls.' Mem. at 1, 9, 11; and (2) the percentage of Floridians who lack health insurance had decreased between 2013 and 2014,[9] in part due to more than 1.6 million Floridians purchasing health plans on the Exchange established under the ACA, Pls.' Ex. 2 at 1.[10]

On May 26, 2015, Florida submitted to CMS its formal request to amend the demonstration to extend the LIP beyond June 30, 2015. *See* Ex. 9. This submission followed "a 30-day public comment period that began on April 21, 2015 and ended on May 22, 2015." *Id.* at 1. Florida also sent CMS a letter that makes no mention of the asserted "coercive condition" (Pls.' Mem. at 2) that Plaintiffs claim Defendants have attached to the LIP. *See* Ex. 8. Instead, Florida's letter states that, based on the May 21 letter and "subsequent clarifying conversations, we understand that the renewed LIP will provide us with enough money to maintain current Medicaid program funding levels." *Id.* at 1. Florida concluded its response by thanking CMS "for all of your assistance,"

---

[9] *See, e.g.*, https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8384.pdf; http://www.gallup.com/poll/181664/arkansas-kentucky-improvement-uninsured-rates.aspx?utm_source=alert&utm_medium=email&utm_content=heading&utm_campaign=syndication.

[10] Florida relies on an Urban Institute study that Florida argues shows that "Florida would face $1.6 billion in uncompensated care even if it opted into Medicaid expansion." Pls.' Mem. at 8. The authors of the cited study disagree with Florida's interpretation of their findings. Matthew Buettgens, *Clarification of Urban Institute Estimates of Uncompensated Care in Florida* (Apr. 21, 2015), http://www.urban.org/sites/default/files/alfresco/publication-pdfs/2000198-Clarification-of-Urban-Institute-Estimates-Of-Uncompensated-Care-in-Florida.pdf. And, in any event, the LIP was "never intended to cover all uncompensated care costs." Pls.' Ex. 3 at 106.

indicating that CMS's "guidance has been essential," and inviting further discussions. *Id.*
Florida attached a "proposal" that would cap the LIP at $1 billion for 2015-2016. *Id.* att.

## STANDARD OF REVIEW

"A party that seeks a preliminary injunction must establish that (1) it has a sub-
stantial likelihood of success on the merits; (2) irreparable injury will be suffered unless
the injunction issues; (3) the threatened injury to the movant outweighs whatever damage
the proposed injunction may cause the opposing party; and (4) if issued, the injunction
would not be adverse to the public interest." *Pine v. City of W. Palm Beach*, 762 F.3d
1262, 1268 (11th Cir. 2014) (internal citation and quotation marks omitted). "A
preliminary injunction is an extraordinary and drastic remedy not to be granted unless the
movant clearly established the burden of persuasion for each prong of the analysis." *Id.*

"Mandamus is an extraordinary remedy available only in the clearest and most
compelling of cases. Mandamus is appropriate only if (1) the plaintiff has a clear right to
the relief requested; (2) the defendant has a clear duty to act; and (3) no other adequate
remedy is available. The party seeking mandamus has the burden of demonstrating that
his right to the writ is clear and indisputable." *Serrano v. U.S. Attorney Gen.*, 655 F.3d
1260, 1263 (11th Cir. 2011) (citations omitted).

## ARGUMENT AND CITATION OF AUTHORITIES

### I.     Plaintiffs Are Not Substantially Likely To Prevail.

Not only are Plaintiffs unlikely to prevail on the merits, they are unlikely even to
establish that there is a final agency action that is ripe for judicial review at this time.

**A.    Plaintiffs' Claim Is Not Properly Before The Court.**

**1.    The April 14 Letter Is Not Final Agency Action.**

The Administrative Procedure Act ("APA") authorizes judicial review of "final agency action." 5 U.S.C. § 704. There has been no such final agency action here, however, and there is accordingly no basis for Plaintiffs' APA claim.

"The Supreme Court has held that an action must satisfy two requirements to be final," *LabMD, Inc. v. FTC*, 776 F.3d 1275, 1278 (11th Cir. 2015): "'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). A determination made by an agency in the course of the administrative process does not "mark the consummation" of its decision making if "the proceeding will continue to a later, final order." *Id.*; *see, e.g.*, *id.* (rejecting the plaintiff's argument that an agency action was reviewable because it will "almost certainly" lead to an adverse final decision). And an action is not one from which "'direct and appreciable legal consequences' flow[]," *id.* (quoting *Bennett*, 520 U.S. at 178), if the action "does not itself adversely affect [the plaintiff] but only affects [the plaintiff's] rights adversely on the contingency of future administrative action," *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) (internal quotation marks omitted).

Even before the May 21 letter (which should have removed any lingering doubt on the point), it was clear enough from both the April 14 letter and Florida's response to

it that the April 14 letter did not "mark the consummation" of CMS's decision-making process and that "the proceeding [would] continue to a later, final order," *id.* The April 14 letter articulates three policy principles that CMS intends to apply as it "approach[es] review of a LIP proposal from Florida," which Florida had not yet even submitted. Pls.' Ex. 1 at 2. Nothing in the April 14 letter establishes that CMS will deny Florida's application unless the State opts into Medicaid expansion. The response from Florida's Medicaid Director recognizes as much, as it indicates that Florida would soon formally request an extension of the LIP, "hope[s] the federal government receives our LIP amendment cordially," Pls.' Ex. 2 at 2, and expects the parties to "agree upon a renewed LIP," *id.* at 1. Those are not the words of a State whose demonstration application has been denied or that believes denial is certainly impending.

Nor does the April 14 letter have "direct and appreciable legal consequences" or determine the "rights or obligations" of either Florida or CMS. *LabMD*, 776 F.3d at 1278. The April 14 letter did not deny Florida's May 26 application to extend the LIP, require Florida to expand its Medicaid program, or condition any extension on the State's expansion status. The April 14 letter therefore is not final agency action under controlling precedent.

In arguing otherwise, Plaintiffs cite only *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), a three-decade-old decision from another circuit that does not apply to the facts of this case. Pls.' Mem. at 13. The Eleventh Circuit has cast doubt on whether the "exception[]" to the finality doctrine represented by *Ciba-Geigy* "applie[s] in this Circuit." *LabMD*, 776 F.3d at 1279 (citing the discussion of *Ciba-Geigy* in *CSI Aviation*

*Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412-13 (D.C. Cir. 2011)). In any event, that exception would not apply here. In *Ciba-Geigy*, the D.C. Circuit allowed the plaintiff to obtain judicial review of the EPA's policy that the agency could seek civil or criminal penalties from the plaintiff without first initiating administrative proceedings – a policy "suggested" in one letter from the agency and then adopted "definitively," "unequivocally," and with "no ambiguity" in a response to the plaintiff's request for clarification. 801 F.2d at 433, 436-37. In contrast, the administrative process here remains ongoing, and Plaintiffs chose to interpret the April 14 letter as conditioning approval of the LIP on Florida's expansion of its Medicaid program, filed suit before confirming what the letter meant, and moved for a preliminary injunction right after Secretary Burwell personally informed Governor Scott that the agency would consider Florida's LIP application even if it does not expand its Medicaid program. It should now be clear that, if CMS has taken a "'definitive' position" (Pls.' Mem. at 13) on this aspect of Florida's extension request, it is not the position that Plaintiffs describe. CMS's purported "policy" is not only non-final but non-existent.

The lack of finality is all the more evident in light of the post-motion May 21 letter from CMS to Florida. As a courtesy to Florida and recognizing Florida's internal legislative calendar, the letter provides "*preliminary* feedback" on the proposal that was then undergoing public comment. Ex. 7, at 1 (emphasis supplied). The letter makes it clear that "a final determination on the LIP" will be made only after "the state's official proposal" is made and CMS reviews the public comments on the proposal. *Id*. But it also suggests that CMS would likely approve some extension of LIP authority.

### 2. Plaintiffs' Claim Is Not Ripe For Judicial Review.

Plaintiffs' action is also unripe for judicial review. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (*NPHA*) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "This doctrine 'is necessary to maintain the separation of powers that is a central feature of the Constitution'" and "protects federal courts 'from engaging in speculation or wasting their resources through the review of potential or abstract disputes.'" *Meza v. U.S. Attorney Gen.*, 693 F.3d 1350, 1357 (11th Cir. 2012) (quoting *United States v. Rivera*, 613 F.3d 1046, 1049, 1050 (11th Cir. 2010)). "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *NPHA*, 538 U.S. at 808. Plaintiffs' suit satisfies neither requirement.

Plaintiffs' coercion claim is not "fit" for judicial review. CMS has *not* decided (finally or even tentatively) to condition Florida's continuation of the LIP on the State's expansion of its Medicaid program. Plaintiffs' claim is therefore "based merely on assumed, potential invasions of their constitutional rights." *Johnson v. Sikes*, 730 F.2d 644, 648-49 (11th Cir. 1984). And because their claim is constitutional in nature, the ripeness considerations that ordinarily would counsel in favor of restraint are reinforced

by "the well-established rule that a court is never to 'anticipate a question of constitutional law in advance of the necessity of deciding it,'" *id.* at 649 (quoting *Ashwander v. TVA*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)).

Whether CMS will ultimately reauthorize some form of LIP, and in what form if it does, "will turn on factual development and policy determinations not now known." *Imperial Carpet Mills, Inc. v. CPSC*, 634 F.2d 871, 874 (5th Cir. 1981); *cf. Texas v. United States*, 523 U.S. 296, 300 (1998) (finding the State's claim unripe because it "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985))).

Nor would immediate judicial review relieve Plaintiffs of any real hardship. First, "the immediate hardship of a 'threat to federalism' … is an abstraction … inadequate to support suit." *Texas*, 523 U.S. at 302. Second, it is not the case that CMS intends to withdraw all federal funding now channeled through the LIP payment mechanism if Florida does not expand its Medicaid program. *E.g.*, Ex. 7. And third, any "uncertainty" that Florida has as to the amount of its future funding does not "constitute[] a hardship for purposes of the ripeness analysis," *NPHA*, 538 U.S. at 811, and, in any event, would not be fully resolved by a decision on Plaintiffs' motion.

Here, as in *LabMD*, "[t]he [agency] is best suited to develop the factual record, continue to evaluate its position on the issues, and apply its expertise to complete the proceeding." *LabMD*, 776 F.3d at 1279. Judicial review at this point – when the agency

has reached only "preliminary" views and has expressly disclaimed the position Plaintiffs seek to challenge – would be premature.

### 3.      Mandamus Is Not Available.

Plaintiffs cannot evade the APA's limits on judicial review by invoking mandamus. *Cf. Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1267-71 (11th Cir. 2011). The mandamus remedy is generally "limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act … about which [an official] ha[s] no discretion whatever." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (citations omitted). Mandamus is unavailable to Plaintiffs because they have not demonstrated that Defendants have a clear nondiscretionary duty to act or that Plaintiffs have exhausted all other avenues of relief. *See Serrano*, 655 F.3d at 1263.

The Secretary has discretion to deny *any* demonstration project request and is required to deny one if, "in the judgment of the Secretary," the project is not likely to assist in promoting the objectives of the Medicaid program. 42 U.S.C. § 1315(a). Section 1115 offers no circumstance(s) in which the Secretary is required to grant demonstration authority and similarly no standards by which to evaluate the lawfulness of any decision by the Secretary not to authorize a demonstration. *See id.* And Plaintiffs certainly have not established that the Secretary's yet-to-be-made determination on their just-submitted request clearly violates the anti-coercion principle on which Plaintiffs rely. *Cf. NFIB*, 132 S. Ct. at 2606 (declining to "fix a line" "where persuasion gives way to coercion").

Moreover, Plaintiffs are simultaneously pursuing both this lawsuit and discussions with Defendants on Plaintiffs' LIP proposal. The ongoing discussions at the

administrative level, which have included the Secretary's personal representation to Governor Scott that the State's expansion status is *not* an obstacle to approval of a LIP proposal and the May 21 letter reiterating that point, will ultimately determine the future of the LIP, including its duration and contours. Mandamus is not available to Plaintiffs while that process plays out.

> **B.    Defendants Have Not Violated The Anti-Coercion Principle Of *NFIB*.**

The anti-coercion principle of *NFIB* is not implicated in this case. As explained above, Defendants – including the Secretary herself – have stated repeatedly to Florida that they *will* consider extending the Florida LIP *whether or not* Florida expands its Medicaid program, a step its legislature is currently considering, but that, *whether or not* Florida expands, Defendants have concerns about the size and structure of the LIP. Indeed, Defendants have taken extraordinary steps to work expeditiously with Florida to craft an acceptable LIP proposal. And the Secretary has demonstrated more than good faith in accommodating the State's desire for expedition despite its tardy submission of its application.

Even if the LIP were to end – and there is no indication in the record that it will – that would *not* mean that Florida would lose even the approximately one-ninth portion of federal Medicaid funding that is channeled by Florida through the LIP. And it is the claimed loss of funding that is central to Plaintiffs' *NFIB* argument. Rather, what Defendants have been proposing is not to terminate the federal funding associated with the supplemental pool without replacement but to *shift* funding from the supplemental pool into higher basic Medicaid rates and managed care capitation rates. *See* Ex. 1, at 1-2;

Ex. 2 at 33-34 of 58, Ex. 7. Defendants' letter of May 21 explains how options are available to Florida – whether or not it expands its Medicaid program – that would allow the State to retain every dime of federal assistance now channeled through the LIP by increasing its Medicaid rates. Ex. 7 at 4.[11]

Even if, for sake of argument and contrary to the evidence, it were assumed that Defendants were threatening to withhold approval of any request to extend the LIP unless Florida decided to expand its Medicaid program, the anti-coercion principle of *NFIB* would not be violated here. As the Court recognized and reaffirmed in *NFIB*, "Congress may use its spending power to create incentives for States to act in accordance with federal policies," and "may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 132 S. Ct. at 2602, 2603. Such conditions can become unconstitutional if Congress has "'crossed the line distinguishing encouragement from coercion,'" *id*. at 2603 (quoting *New York v. United States*, 505 U.S. 144, 174-75 (1992)), but the line "where persuasion gives way to coercion" is not a clear one, *id*. at 2606. Thus, "[i]n the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own." *Id*. at 2603 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)).

Unlike the funding condition in *NFIB*, the hypothetical funding condition here would not cross the line into coercion. *NFIB* relied in substantial part on the States'

---

[11] This shift in funding from the LIP toward Medicaid rates was anticipated by the parties' 2014 agreement regarding potential programmatic reforms, and Plaintiffs do not suggest that they were coerced into that agreement.

reliance interest in continuing their Medicaid programs given the "intricate statutory and administrative regimes [developed] over the course of many decades to implement their objectives under existing Medicaid." *Id.* at 2604. No similar interest exists here. The supplemental pool is a time-limited demonstration project that is only ten years old. While all States are eligible to participate in the Medicaid program if their state plans satisfy federal requirements, demonstration projects are just that – demonstrations – subject to cancellation or non-renewal upon the expiration of the approved project term. Insofar as *NFIB* suggests that States may reasonably anticipate the continued receipt of some level of federal Medicaid funding, it would not be reasonable for a State to rely in the same way on the continuation of a subset of Medicaid funding that is provided through an entirely discretionary and temporary demonstration project. As Florida itself points out, such projects are designed to "demonstrate a hypothesis of what healthcare goals the State is trying to accomplish" and evaluate "how well the program met that hypothesis." Compl. ¶ 29.[12] It should be no surprise that, once sufficient evidence is gathered, such an experimental authority, outside of normal statutory requirements, may come to an end. Florida has even less ground to complain of surprise or reliance on continuation of the LIP at 2014 levels, since the 2014 agreement to which Florida was a party itself contemplated that, after the one-year "transition" period agreed to was concluded, Florida would consider shifting LIP funding into higher rates. Florida cannot credibly claim reliance on any belief that the parties would not follow through on the very reforms they agreed to explore in 2014.

---

[12] The Complaint paragraph numbers cited throughout are those in No. 3-15-cv-193.

Moreover, given the amount of LIP funding at issue, this is not the atypical case where the State has no "legitimate choice whether to accept the federal conditions in exchange for federal funds." 132 S. Ct. at 2602-03. This "gun to the head" test was found to be satisfied in *NFIB* as the provision in question required States to take on substantial new obligations – that the Court viewed as a new spending program – or else lose *all* federal Medicaid funding, which accounts for ten to twenty percent of the average State's total budget. *Id.* at 2604. The Court strongly suggested that a provision that merely took away "'a relatively small percentage' of [a State's] existing Medicaid funding" would be permissible. *Id.* (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)). Here, according to the numbers provided by Plaintiffs (*e.g.*, Compl. ¶¶ 27, 41) as well as publicly available figures,[13] in 2014 Florida's LIP accounted for $1.3 billion in federal funding, compared to Florida's $12 billion in total 2013 federal Medicaid funding (10.8%), $20 billion in total (state plus federal) 2013 Medicaid spending (6.5%), and $74.2 billion in overall 2014 state expenditures (1.8%).

These numbers stand in stark contrast to the provision struck down in *NFIB*, which would have withheld ten times as much funding from Florida (according to these same 2014 numbers), and 16.2% of Florida's overall budget rather than just 1.8% of it. But even 1.8% of Florida's budget overstates any potential impact here: The Secretary's letter of May 21 indicates a willingness to accept a LIP at nearly half the current level, bringing even the largest possible budget impact below 1% of Florida's overall budget.

---

[13] Nat'l Ass'n of State Budget Officers, State Expenditure Report at 8 (2014), http://www.nasbo.org/sites/default/files/State%20Expenditure%20Report%20%28Fiscal%202012-2014%29S.pdf.

With these figures in mind, the alleged threat to withhold LIP approval is more analogous to the threatened loss of five percent of federal highway funds (amounting to 0.5% of South Dakota's overall state budget) in *South Dakota v. Dole* than the loss of all Medicaid funding, amounting to ten to twenty percent of a State's overall budget, at issue in NFIB, or to the ACA's maintenance-of-effort amendment to the existing Medicaid program that was sustained, post-*NFIB*, in *Mayhew v. Burwell*, 772 F.3d 80, 92-93 (1st Cir. 2014), *pet. for cert. pending* (No. 14-992). *See also Texas v. EPA*, 726 F.3d 180, 197 (D.C. Cir. 2013) ("Even assuming a temporary construction delay of up to twelve months for new major emitting facilities is significant, State petitioners make no effort to demonstrate this delay is of the same magnitude and nature as the Medicaid expansion provision that would strip 'over 10 percent of a State's overall budget.'" (quoting *NFIB*, 132 S. Ct. at 2605)); *NCAA v. Governor of New Jersey*, 730 F.3d 208, 233-34 (3d Cir. 2013) ("We also disagree with the suggestion that the choices states face under PASPA are as coercive as the Medicaid expansion provision struck down in *Sebelius*, which threatened states unwilling to participate in a complex and extensive federal regulatory program with the loss of funding amounting to over ten percent of their overall budget"), *cert. denied*, 134 S. Ct. 2866 (2014).

Finally, as noted above, *NFIB* also stressed that, compared to the original Medicaid program, the expansion of Medicaid contemplated by the ACA amounted to a "new program," 132 S. Ct. at 2605. While "[t]he original [Medicaid] program was designed to cover medical services for four particular categories of the needy," the expansion "transformed into a program to meet the health care needs of the entire

nonelderly population with income below 133 percent of the poverty level." *Id.* at 2605-06. By contrast with the situation in *NFIB*, the LIP and the ACA expansion overlap. The LIP was designed in part to cover provider costs related to the same "expansion" population as the ACA expansion (indeed, that departure from the contours of the "original program" is one reason demonstration authority was required). Thus, the ACA expansion, rather than being a whole "new program" extending beyond the scope of the existing LIP, provides a different (and, in the Secretary's view, better) way of doing one of the very things the LIP has been doing: compensating providers who provide health care to the expansion population. Thus, as Florida at least "voluntarily agreed" to in practice (Pls.' Mem. at 1, 9), the LIP should no longer be used to pay for medical care provided to the "expansion" population, and any such reduction of the LIP in no way runs afoul of *NFIB*.

## II.   The Requested Relief Is Not Necessary To Prevent Irreparable Harm.

The extraordinary relief Plaintiffs seek is unnecessary to prevent irreparable harm, and inadequate to address Plaintiffs' concerns about the elimination of LIP funding.

The remedy Plaintiffs request – an order "requiring Defendants to reconsider [*sic*] the renewal of federal funding for Florida's [LIP] program without regard to whether Florida opts into Medicaid expansion," Mot. 2 – is unnecessary because, as Defendants have repeatedly informed Plaintiffs, CMS's extension of demonstration authority for the LIP is not contingent upon Florida's decision regarding Medicaid expansion. There is therefore nothing for her to "reconsider." Because Defendants are *not* "leveling the … coercive threats" Plaintiffs decry, Pls.' Mem. at 2, Plaintiffs' requested relief would not

have any meaningful effect on the parties' conduct going forward. The Court should not use its equitable powers merely to "command a gesture" by Defendants. *Weber v. United States*, 209 F.3d 756, 760 (D.C. Cir. 2000).

Moreover, while Plaintiffs claim they will suffer irreparable harm if the LIP expires on June 30, 2015, Plaintiffs have not asked the Court to order the Secretary to extend the LIP beyond that date. Nor do they have grounds for making requesting such a mandatory injunction to alter the status quo. Plaintiffs have no right to an extension of the LIP, let alone before the conclusion of the regulatory review period, given the Secretary's complete discretion under Section 1115 to disapprove any demonstration project. And, although Florida's late submission of its amendment request means it may not receive formal approval until after June 30, the Secretary may authorize a temporary extension, 42 C.F.R. § 431.412(c)(4) – if Florida asks for one, which it has not done despite its claims of an emergency – and may provide the State with additional feedback before rendering a final decision. Thus, the requested relief should be denied because it would not eliminate the potential harm Plaintiffs seek to avoid.

Even if the LIP were to expire at the end of June, Plaintiffs' asserted harms are largely unfounded. Plaintiffs claim they need an injunction so Florida can continue operating the LIP "in its current form" (Pls.' Mem. at 20, 23) and offering providers "the same type of funding" as in past years (*id.* at 20). But retaining the LIP "in its current form" is an option Florida agreed to take off the table in 2014 when it committed to start taking steps toward reforms that would make the LIP unnecessary. *See* Ex. 1. Plaintiffs now complain about having to "expend massive time and resources" to transition away

from the LIP (Pls.' Mem. at 23), but Florida has had a year to begin preparing to make the transition it agreed to last spring as a condition of the limited 2014-2015 extension of demonstration authority for the LIP.

Plaintiffs also exaggerate the potential effects on patients and providers. Plaintiffs allege that CMS is "using as a bargaining chip the vulnerable populations" that "will lose the benefits of the LIP" if it expires. *Id.* at 18. This is not correct. While LIP provides funding directly to *providers*, it does not bestow any coverage or other rights on *patients* in vulnerable (or any) populations: No one has a LIP card that they can show a provider as a means of getting treatment. Plaintiffs also exaggerate the financial consequences for hospitals by identifying the payments the hospitals expect from the LIP without subtracting the amounts the hospitals or their local sponsors pay into the program. *Compare id.* at 5, 21, *with* Pls.' Ex. 3 at 224, 228, 229, 231 (2012-13 local contributions to the LIP) *and* Pls.' Ex. 6 at 56-61 (2015-2016 projections). Plaintiffs have not shown that any hospital, with its revenue from other sources and possible retention of local contributions, would be unable to fulfill its obligations to provide care to those who cannot pay while Florida makes additional funding available by means other than the LIP.

## III. The Public Interest And Balance Of Equities Weigh Against Plaintiffs.

The remaining injunction factors also weigh decidedly against granting Plaintiffs the relief they seek. With or without the LIP funding mechanism, and with or without Medicaid expansion, Florida has choices to make about its healthcare priorities – including how best to address the needs of the third largest uninsured population in the

country, Pls.' Ex. 3 at 111, and how to transition to the reforms of LIP funding that the parties agreed to pursue in April of 2014. It may be that Florida's Governor and legislators are having difficulty agreeing among themselves on how best to achieve these goals. Even in Florida's motion papers, there is a proposal of the state executive branch (Pls.' Ex. 5) and a different proposal of the state Senate (Pls.' Ex. 6). Defendants will promptly consider the amendment request that Florida just submitted on May 26. The Secretary took extra steps on May 21 by providing extensive "preliminary feedback" to aid Florida in its deliberations, even though Florida had yet to submit an amendment request. But neither Defendants nor this Court can make the decisions that are required from Florida's elected officials.

The Secretary also has a decision to make, the one committed to her discretion by Congress: whether, "in the judgment of the Secretary," Florida's request to extend the LIP, or a modified version of that request, warrants approval because she has determined that it is likely to assist in promoting the objectives of the Medicaid program.

The public interest is best served by allowing both Florida and the Secretary to make the policy decisions that the Constitution and Medicaid Act assign to them without premature judicial interference before those decisions are made.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for preliminary injunction or, in the alternative, petition for a writ of mandamus.

June 1, 2015                                    Respectfully submitted,

                                               BENJAMIN C. MIZER
                                               Principal Deputy Assistant Attorney General

                                               SHEILA M. LIEBER
                                               Deputy Branch Director

                                                /s/  Brian G. Kennedy
                                               BRIAN G. KENNEDY
                                               District of Columbia Bar No. 228726
                                               MATTHEW J. BERNS
                                               District of Columbia Bar No. 998094
                                               Trial Attorney
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Avenue, NW
                                               Washington, DC 20530
                                               (202) 514-3357
                                               Brian.Kennedy@usdoj.gov
                                               Matthew.J.Berns@usdoj.gov

                                               *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2015, I filed the foregoing via this Court's

CM/ECF system, which will result in service on all counsel of record.

                                                /s/  Brian G. Kennedy
                                               BRIAN G. KENNEDY
                                               *Counsel for Defendants*