IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| RICK SCOTT, in his official capacity as Governor of Florida; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; *et al.*,<br><br>Defendants. | CASE NO. 3:15-cv-193-MCR-CJK<br>3:15-cv-195-MCR-CJK |

## DECLARATION OF ELIOT FISHMAN

I, ELIOT FISHMAN, hereby declare the following, based on personal knowledge:

1. I am the Director of the Children and Adults Health Programs Group at the Centers for Medicare & Medicaid Services (CMS) within the U.S. Department of Health and Human Services (HHS). I have held this position since July 2013. In this capacity, I oversee CMS's work on eligibility, enrollment, and quality of care for Medicaid and Children's Health Insurance Program (CHIP) beneficiaries.

2. Prior to working at CMS, I was a Principal at Health Management Associates, a consulting firm specializing in Medicaid and other health policy issues for low-income people, where I focused on Medicaid delivery system and payment reforms, streamlining Medicaid eligibility, enrollment, and retention processes, and advancing health information technology. I have also worked as Vice President of Metropolitan Jewish Health System, a large non-profit integrated delivery system in New York, and as Director of the Office of Policy in the New

Jersey Department of Health. I hold a Bachelor's Degree from Harvard College and a Ph.D. in political science from Yale University.

3. One of my major responsibilities in my current position is overseeing and supervising the Division of State Demonstrations and Waivers, an office within the Children and Adults Health Programs Group. The principal mission of the Division of State Demonstrations and Waivers is to analyze and process applications under Section 1115 of the Social Security Act (42 U.S.C. § 1315), which provides the Secretary of HHS with broad authority to authorize State experimental, pilot, or demonstration projects that the Secretary concludes are likely to assist in promoting the objectives of the Medicaid program. Section 1115 allows the Secretary to waive certain statutory requirements of the Medicaid program. Under Section 1115 demonstrations, States may claim federal Medicaid matching payments for populations and services that are otherwise not allowable under Medicaid statute or regulation. This is known as "expenditure authority."

### Florida's MMA Demonstration and LIP

4. CMS initially approved the Florida Medicaid Reform demonstration (later renamed the Florida Managed Medical Assistance (MMA) program demonstration), under the authority of section 1115 of the Social Security Act, 42 U.S.C. 1315, on October 19, 2005, with an effective date of July 1, 2006. The overall purpose of the waiver was to begin the transition of Florida's Medicaid program from fee-for-service to managed care. The demonstration project included waivers of certain provisions of the Medicaid statute, and an expenditure authority for the Low Income Pool (LIP).

5. The LIP was a time-limited demonstration meant to support Florida safety net providers that provide uncompensated care to the Medicaid, underinsured, and uninsured

populations. Nearly all of the non-federal share of LIP funding is provided not by the State but by intergovernmental transfers from local governments and public hospitals. Most LIP payments go to hospitals, and the amount of the payment received by hospitals varies depending on the availability of locally generated matching funds, rather than depending on the volume or proportion of a hospital's services delivered to Medicaid or uninsured individuals as compared to other hospitals.

### 2014 Extension of Florida's MMA Demonstration and LIP

6.  CMS and Florida negotiated the terms under which the LIP could continue before it was scheduled to expire on June 30, 2014. During those negotiations CMS expressed to Florida its concerns with the program, including concerns that LIP funding was not transparent and that LIP payments to providers did not correspond to services provided to Medicaid beneficiaries and low-income uninsured individuals.

7.  In April 2014, CMS and Florida reached an agreement in principle for a one-year renewal of the LIP, which was memorialized in an April 11, 2014 letter from Cindy Mann, then-Director of the Center for Medicaid and CHIP Services (CMCS) within CMS, to Justin Senior, the Medicaid Director for Florida's Agency for Health Care Administration (AHCA). Exh. 1.

8.  On July 31, 2014, CMS approved the MMA demonstration (except for the LIP) for the period July 31, 2014 through June 20, 2017, and formally extended the LIP only through June 30, 2015. CMS's approval of the demonstration (including the LIP) was subject to "Special Terms and Conditions" (STCs), a 58-page document that described in detail what Florida was obligated to do during the life of the demonstration. Exh. 2.

9.  The LIP was capped at approximately $1 billion per year (total computable) for the first eight years of the demonstration. The 2014 one-year extension authorized a LIP of

$2.16 billion (total computable). The increase in LIP funding in 2014 was to assist the State in completing its transition to managed care statewide; the increase replaced certain supplemental payments that the State had been making under fee-for-service and that could not be made in managed care.

10. The STCs explained that the LIP expenditures were "authorized to provide stability for providers, for a limited time" and directed Florida to "develop a plan to reform Medicaid provider payments and funding mechanisms, with the goal of developing sustainable, transparent, equitable, appropriate, accountable, and actuarially sound Medicaid payment systems and funding mechanisms that will ensure quality health care services to Florida's Medicaid beneficiaries throughout the state without the need for LIP funding." Exh. 2, STCs at 3. CMS also directed the State to commission an independent report on its hospital financing to "recommend reforms . . . that can allow the state, beginning in state fiscal year 2015-2016, to move toward Medicaid managed care and fee-for-service payments that ensure access for Medicaid beneficiaries to providers throughout the state through such payments rather than through over reliance on supplemental payments." Exh. 2, July 31 letter at 1.

11. Florida accepted these Special Terms and Conditions in a July 31, 2014 letter from Elizabeth Dudek, the Secretary of Florida's AHCA. Exh. 3.

### Ongoing Discussions Between CMS and Florida About Extending the LIP Beyond June 30, 2015

12. Beginning in January 2015, CMS has been engaged with Florida in discussions about possible modifications to, and renewal of, the LIP. I have been heavily involved in these discussions and have had numerous conversations with Justin Senior, the Medicaid Director for Florida's Agency for Health Care Administration, about the subject.

13. Typically, when a State wishes to renew a Section 1115 demonstration project that is due to expire, it will submit a formal renewal application to CMS for consideration at least one year prior to the expiration of the project as required by HHS regulations. Amendments to ongoing demonstration projects – like Florida's request to extend the LIP – are not subject to that regulatory deadline, but the STCs agreed to by Florida for the overall MMA demonstration, at paragraph 7, specifically provide that amendments must be submitted no later than 120 days prior to the planned implementation date.

14. Although Florida began informal negotiations with CMS around the renewal of LIP funding in January 2015, Florida only submitted its formal amendment to extend the LIP on May 26, 2015.

15. In paragraph 8 of his declaration, Mr. Senior states that Florida "informed CMS that by April we needed only a letter expressing agreement about the amount of the LIP and general information on the flow of funds" and that "CMS stated that it would be flexible with the waiver amendment process, and that our agencies would work together as we had in the past to arrive at that agreement in principle through informal negotiations." Although Florida has repeatedly asked CMS to consider entering into an agreement in principle regarding the LIP as we did in April 2014, I have no recollection of anyone at CMS indicating that CMS and Florida would arrive at another such agreement by April 2015.

16. It is relatively unusual for CMS to enter into informal agreements in principle related to Section 1115 demonstration projects. CMS was willing to enter in an agreement in principle in 2014 because we had received a formal proposal from the State and, aside from funds that were meant to replace supplemental payments the State had made under fee-for-service, the 2014 extension would essentially freeze the existing LIP in place for one additional

year. By contrast, the Special Terms and Conditions for 2014 contemplated that in 2015 Florida would instead implement major reforms of its LIP. Now that CMS has received a formal proposal from Florida (on May 26th) CMS is reviewing the proposal to determine the extent it satisfies the 2014 STCs.

17.     In February and March 2015, Florida approached CMS with broad outlines of potential LIP approaches, simple spreadsheets with basic tables and without any explanatory narrative. We understood the various proposals Florida sent us during this time to be exploratory.

18.     In paragraph 12 of the Senior Declaration, Mr. Senior states that "[o]n or about March 9, 2015" Florida "sent a package of materials to CMS, which included scenarios for LIP funding that [AHCA] felt addressed the concerns CMS had with the current LIP program." That "package" was an informal set of materials, which appeared to be yet another variation on what the State had sent previously. Again, there was no explanatory narrative. CMS had trouble interpreting what the State was proposing. Because of the general and exploratory nature of what Florida had given CMS, it would not have been appropriate to reach an agreement in principle by April as Florida wished.

19.     Mr. Senior also states that "[o]n or about March 26, 2015, AHCA followed up with an additional plan for renewed LIP funding authored by the Florida Senate." Sen. Decl. ¶ 12. This "plan" was proposed legislation then under debate in the Florida legislature, and its premises were inconsistent with the broad draft plan that Florida had given to CMS on March 9, 2015. Mr. Senior handed me this Senate proposal in an informal one-on-one meeting that took place after I had done a presentation at a conference. He did not characterize the Senate proposal as a formal proposal by the State.

20. Mr. Senior states in paragraph 16 of his declaration that "Florida has expressed its willingness to size the uncompensated care element of the LIP based upon a reasonable estimate of uncompensated care that would persist post-expansion." While Florida has expressed that willingness, the State did not present CMS with any LIP proposal based on a reasonable estimate that excludes costs that could be covered by Medicaid expansion. The Senate proposal does not purport to exclude such costs. While on March 26, Mr. Senior told me that the AHCA could accept excluding expansion coverage costs as an alternative to the Florida Senate's proposal, on May 9th he stated that the State's proposed estimate of uncompensated care that would persist post-expansion was equal to the current size of the LIP and therefore equal to the Senate proposal.

21. In paragraph 14 of his declaration, Mr. Senior states that "on or about April 1, 2015, CMS informed us that the representative of CMS with whom we had been negotiating since January would be unavailable for any additional meetings for 2 weeks." I am the CMS representative referred to in this paragraph. I was unavailable between April 2 and April 14, 2015, due to a long-scheduled vacation to Europe and then to Israel for Passover. I had told Mr. Senior about my vacation beforehand, as he later acknowledged. Exh. 4 (April 3, 2015 email from Justin Senior to Eliot Fishman). Representatives of Florida were informed that in my absence they should communicate with Julia Hinckley, my senior policy advisor on 1115 demonstrations, who was intimately familiar with the Florida discussions. I made sure that Ms. Hinckley had the latest information about the state of those discussions before I left on my trip.

**Other States' Pools for Reimbursing Hospitals' Uncompensated Care Costs**

22. CMS has approved 1115 demonstration projects in several States that, like Florida's LIP, use funding pools for hospital uncompensated care costs. For example, CMS has

approved such projects in Arizona and California (which have expanded their Medicaid programs under the Affordable Care Act) and Kansas, and Texas (which have not).

23. In their amicus brief, the governors of Texas and Kansas refer to California's Section 1115 Waiver, which was originally approved in August 2005 and most recently renewed for the period November 1, 2010, through October 13, 2015. California submitted its waiver extension application to CMS March 27, 2015, and it is currently under review.

24. CMS has told every other State with a pool for hospital uncompensated care that the agency intends to apply the same principles to them. I have personally communicated to other States, including California and Arizona (with have expanded their Medicaid programs under the Affordable Care Act) and Texas and Kansas (which have not), that we will apply these principles to them. For example, on April 17, 2015 I spoke by phone to Mari Cantwell, Chief Deputy Director of Health Care Programs in California's Department of Health Care Services, and explained that CMS intends to apply the principles articulated in the April 14, 2015 letter when evaluating California's pending 1115 renewal package. I also discussed that letter with Kansas and Arizona and forwarded it to their representatives by email on April 15, 2015. Exhs. 5, 6.

25. Attached hereto as Exhibit 1 is a true and correct copy of an April 11, 2014 letter from Cindy Mann to Justin Senior memorializing the agreement in principle between CMS and Florida regarding extension of LIP from July 1, 2014 through June 30, 2015.

26. Attached hereto as Exhibit 2 is a true and correct copy of a July 31, 2014 letter from Cindy Mann to Justin Senior approving an extension of the LIP through June 30, 2015, and attachments including the Special Terms and Conditions.

27.     Attached hereto as Exhibit 3 is a true and correct copy of a July 31, 2014 letter from Elizabeth Dudek, Secretary of Florida AHCA, accepting the Special Terms and Conditions listed in the approval letter.

28.     Attached hereto as Exhibit 4 is a true and correct copy of an email that Justin Senior sent to me on April 3, 2015 acknowledging that he had known I would be on vacation.

29.     Attached hereto as Exhibit 5 is a true and correct copy of an April 15, 2015 email from me to Kansas, forwarding the April 14, 2015 letter from Vikki Wachino to Justin Senior.

30.     Attached hereto is Exhibit 6 is a true and correct copy of an April 15 email from me to Arizona, forwarding the April 14, 2015 letter from Vikki Wachino to Justin Senior.

Executed this 1st day of June, 2015

_____
Eliot Fishman